WORLD AIRWAYS, INC., AND WORLD AIR CENTER, INC., PETITIONERS *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 6127–70. Filed September 18, 1974.

---

*Hart H. Spiegel* and *La Verne L. Dotson*, for the petitioners. *Randall G. Dick*, for the respondent.

BRUCE, *Judge:* Respondent determined deficiencies in petitioners' income tax for the years and in the amounts as follows:

| Year | Deficiency |
|------|-----------|
| 1965 | $45,095 |
| 1966 | 873,121 |

Other issues raised by the pleadings having been disposed of by agreement between the parties, the following two issues remain for our consideration:

(1) Whether petitioner may accrue and deduct in each year a portion of estimated costs for the future overhauls of its aircraft engines and airframes; and

(2) Whether petitioner is entitled to an investment credit for an airplane leased to the Federal Aviation Administration for a series of 1-year periods extending from September 1966 through June 1969.

## *General*

### FINDINGS OF FACT

Some of the facts have been stipulated and the stipulations and attached exhibits are incorporated herein by this reference.

Petitioner World Airways, Inc., is a corporation organized and existing under the laws of the State of Delaware. Petitioner World Air Center, Inc., is a wholly owned subsidiary of World Airways, Inc., and is a corporation organized and existing under the laws of the State of California.

Each corporation had its principal office at the Oakland International Airport, Oakland, Calif., on September 21, 1970, the date of the filing of the petition in this case.

The petitioners filed consolidated income tax returns for the taxable years ended December 31, 1965, and December 31, 1966, with the district director of internal revenue at the San Francisco District, San Francisco, Calif.

The taxable income of the petitioners as reflected on their income tax returns filed for the taxable years ending December 31, 1965, and December 31, 1966, was computed on the accrual method of accounting, which is the method regularly used by the petitioners in keeping their books of account.

No part of the deficiencies in controversy relate in any way to the determination of the taxable income derived solely from the operations of World Air Center, Inc., and that company is a party herein solely because it filed a consolidated return with World Airways, Inc. (hereinafter referred to as petitioner).

Petitioner now is, and throughout the period in controversy was, a supplemental air carrier authorized by the Civil Aeronautics Board

(hereinafter referred to as CAB) to provide charter air transportation service.

Petitioner provides, and throughout the years in controversy has provided: (1) Charter air transportation services for the Military Airlift Command in the international transportation of passengers and cargo; (2) air transportation of cargo between military installations located in the continental United States; (3) domestic air transportation of passengers in Civil Air Movements for the Department of Defense; and (4) commercial charters for the air transportation of passengers and cargo domestically and internationally.

## 1. *Issue re Overhaul Expense*

### FINDINGS OF FACT

During 1965, petitioner operated four Boeing model 707–373C convertible fan-jet aircraft and six Douglas DC–6 A/B convertible piston aircraft. During 1966, petitioner operated six Boeing model 707–373C convertible fan-jet aircraft and six Douglas DC–6 A/B convertible piston aircraft.

Piston aircraft No. 45502 flown by petitioner during 1965 and 1966 was leased from E. J. Daly.

The total cost of the six Boeing 707 jet aircraft (including spare engines and parts) owned and operated by petitioner at December 31, 1966, was $48,270,068. The total cost of the five Douglas DC–6 A/B convertible piston aircraft (including spare engines and parts) owned and operated by petitioner at December 31, 1966, was $3,423,522.

During each year in controversy petitioner claimed, and was allowed, for Federal income tax purposes, depreciation deductions for the aircraft referred to above computed on the basis of a 6-year life and in accordance with the double-declining-balance method pursuant to Rev. Proc. 62–21.

For financial-reporting purposes, piston aircraft were depreciated over 3 years and jet aircraft were depreciated over 12 years to 15-percent salvage value. Before January 1, 1966, jet aircraft were being depreciated to 10-percent salvage over 10 years.

Petitioner is subject to the Federal Aviation Act of 1958, as amended, under which the Civil Aeronautics Board and the Federal Aviation Administration (hereinafter referred to as FAA) assert regulatory authority over its operations.

In accordance with FAA regulations, petitioner had in effect, and presently has in effect, a maintenance program which provides for overhaul of airframes and engines upon the completion of a prescribed number of flight-hours. This maintenance program must be and was approved by the FAA, and is subject to modification at the initiative

of either the FAA or petitioner. Overhauls were performed in accordance with the time limitations outlined in the operation specifications which were in effect at the time of the particular overhaul. The above-mentioned operation specifications were part of the FAA-approved maintenance program. Piston aircraft were overhauled in accordance with operation specifications similar to those for jets.

Effective on the dates stated, the FAA approved amendments to World Airways, Inc.'s operating specifications which increased the time between jet airframe overhauls as follows:

| From (original hours) | To | Effective date |
|---|---|---|
| 2,500 hrs | 4,000 hrs | 6/24/64 |
| 4,000 hrs | 6,000 hrs | 1/27/65 |
| 6,000 hrs | 7,000 hrs | 12/14/66 |
| 7,000 hrs | 8,000 hrs | 1/10/68 |
| 8,000 hrs | 9,000 hrs | 1/6/69 |
| 9,000 hrs | 10,000 hrs | 7/8/69 |
| 10,000 hrs | 12,000 hrs | 12/14/70 |

Also, the FAA approved amendments to petitioner's operating specifications which increased the time between jet engine overhauls as follows:

| From (original hours) | To | Effective date |
|---|---|---|
| 1,400 hrs | 1,600 hrs | 4/7/64 |
| 1,600 hrs | 2,000 hrs | 6/3/64 |
| 2,000 hrs | 2,200 hrs | 1/29/65 |
| 2,200 hrs | 2,500 hrs | 5/24/65 |
| 2,500 hrs | 2,700 hrs | 9/27/65 |
| 2,700 hrs | 2,900 hrs | 1/11/66 |
| 2,900 hrs | 3,500 hrs | 3/17/66 |
| 3,500 hrs | 4,500 hrs | 6/10/66 |
| 4,500 hrs | 5,500 hrs | 10/14/66 |
| 5,500 hrs | 8,000 hrs | 3/3/67 |
| 8,000 hrs | 9,000 hrs | 5/20/68 |
| 9,000 hrs | 10,000 hrs | 10/3/68 |
| 10,000 hrs | 12,000 hrs | 7/16/69 |
| 12,000 hrs | 16,000 hrs | 7/13/70 |

On December 20, 1965, petitioner entered into a written contract with Trans World Airlines, Inc. (hereinafter referred to as TWA), pursuant to which TWA agreed to perform all major airframe and engine overhauls on petitioner's entire fleet of jet airframes and jet engines. All major overhauls of jet airframes and jet engines completed during 1965 and 1966 were performed by TWA and all major overhauls completed subsequent to 1966 on jet airframes and jet engines flown by petitioner during 1965 and 1966 were also performed by TWA.

The contract between petitioner and TWA provided that payment for each overhaul would be made in two parts. The first part was

an immediate payment due at the time of completion of the overhaul. The amount of this payment was computed by multiplying a rate specified in the contract by the number of hours of flight time accumulated on the airframe or engine since its previous overhaul. The hourly rate used in calculating the immediate payment was determined by estimating the cost of an overhaul and dividing that figure by the number of hours currently allowed to be flown between overhauls. The contract provided that hours of flight time occurring prior to the date of the contract would be included in accumulated flight time.

The second part of a payment for an overhaul was an adjusting payment. This adjustment was the result of the contract's explicit recognition that changes in TWA's wage rates and hours of labor applicable to engine overhaul (or hot section inspection/repair) and costs of materials would have to be reflected in TWA's charges for services rendered. The contract provided that within 45 days after each December 31 during the term of the agreement, TWA would furnish to petitioner a detail of charges setting forth the actual and total cost of each overhaul completed prior to December 31. Thereupon, the necessary adjusting payment would be made between the parties.

The contract specified that the hourly rate used in determining the initial payment did not include work done in connection with "Airworthiness Directives, Service Bulletins, and Modifications." Also, the hourly rate did not include charges for parts rework done by TWA or reconditioning of parts requiring factory repair.

In January 1967, the contract between petitioner and TWA was amended, first, to change the hourly rate to be applied in determining the immediate payment due on the completion of an overhaul and second, to provide for the payment of interest on the adjusting payment made after December 31. The effective date of the amendment was December 31, 1966, but the revised rates applied to all flight time since last overhaul regardless of whether such time occurred prior to December 31, 1966. The original and amended hourly rates used in computing the immediate payment for the types of overhauls under the contract are as follows:

| Type of overhaul | Before amendment | After amendment |
| --- | --- | --- |
| Engine overhaul | $18. 50 | $10 |
| Hot section inspection | 5. 75 | 4 |
| Airframe overhaul | 33. 00 | 38 |

That part of the contract providing for the initial payment reads as follows:

2.2. World agrees to pay to TWA for each such engine overhaul, in respect of each engine set forth in Schedule A hereto annexed, the amount of $18.50 for each hour of accumulated flight time of each such engine since last overhaul

(TSO) to December 31, 1965, and World does hereby acknowledge that it is indebted to TWA for the amount of the cost of such engine overhaul at the rate of $18.50 per hour on such accumulated engine time (TSO) computed from the last overhaul of such engine to December 31, 1965. World further agrees to pay to TWA for each such engine overhaul the amount of $18.50 for each hour of accumulated engine flight time from January 1, 1966 to the date of overhaul of each such engine. Payment shall be made by World to TWA for each engine overhaul at the time of completion of such engine overhaul.

Under this contract, petitioner made no payments to TWA unless TWA actually performed an overhaul. If a jet airframe or engine were sold or otherwise disposed of, or retired from use, petitioner would not be required to make any payment to TWA for any amount accrued in an expense account.

On December 22, 1965, petitioner entered into a contract with Aviation Power Supply, Inc. (hereinafter referred to as APS), under which APS agreed to perform engine overhauls on all of petitioner's piston engines. All major overhauls of piston engines completed during 1965 and 1966 were performed by APS and all major overhauls completed subsequent to 1966 on piston engines flown by petitioner during 1965 and 1966 were also performed by APS.

The contract between petitioner and APS relating to the overhaul of piston engines also provided that payment for each overhaul would be made in two parts. The first part was an immediate payment due at the time of the completion of the overhaul. The amount of this payment was computed by multiplying an hourly rate of $6.96 by the number of hours of flight time accumulated on the engine since its previous overhaul. The contract provided that hours of flight time occurring prior to the date of the contract would be included in accumulated flight time.

The second part of a payment for an overhaul was an adjusting payment. This adjustment was the result of the contract's explicit recognition that changes in APS' costs for labor and materials would have to be reflected in APS' charges. The contract provided that within 45 days after each December 31 during the term of the agreement, APS would furnish to petitioner a Detail of Charges setting forth the actual and total cost of each overhaul completed prior to December 31. The necessary adjusting payment would then be made between the parties.

The contract specified that the hourly rate did not include charges for parts rework or replacement material required for the engine.

That part of the contract providing for the initial payment reads as follows:

2.1 WORLD agrees to pay to APS for each such engine major overhaul, in respect to each engine set forth in Schedule A, hereto annexed, the amount of $6.96 for each hour of accumulated flight time of each such engine since

last overhaul (TSO) to December 31, 1965, and WORLD does hereby acknowledge that it is indebted to APS for the amount of the cost of such engine overhaul at the rate of $6.96 per hour for such accumulated engine time (TSO) computed from the last overhaul of such engine to December 31, 1965. WORLD further agrees to pay APS for each engine major overhaul, the amount of $6.96 for each hour of accumulated engine flight time from January 1, 1966 to the date of overhaul of each such engine. Payment shall be made by WORLD to APS for each engine overhaul at the time of completion of such engine overhaul.

Under this contract, petitioner made no payments to APS unless APS actually performed an overhaul. If a piston aircraft were sold or otherwise disposed of prior to the time for an engine overhaul, then petitioner would make no payment to APS for any amount accrued in an expense account.

All overhauls of the piston airframes flown by petitioner were performed by World Air Center, Inc. Petitioner had no written contract with its subsidiary for the overhaul of the piston airframes.

Throughout the years in controversy, petitioner maintained, and currently maintains, expense accounts for each aircraft which are accumulated in a single account entitled "Direct Maintenance—Flight Air Worthiness Provisions," which account is carried over to its profit-and-loss statement. Similarly, throughout the years in controversy, petitioner maintained, and currently maintains, a series of subaccounts which are accumulated into one account entitled "Flight Equipment—Air Worthiness Reserves," which is carried over to the credit side of its balance sheet. On published financial statements this account is entitled "Accrued Airframe and Engine Overhaul Expense." On petitioner's corporate income tax returns for 1965 and 1966 it is included in the accounts payable figure on the balance sheets.

Pursuant to the FAA regulations, petitioner maintained an accurate log of the number of flight-hours of each airframe and engine. Petitioner used this log in determining the number of flight-hours since the last overhaul.

During the period of time between overhauls, for every hour that one of its aircraft flew, petitioner recorded as an expense an amount for the estimated cost of future overhauls which it attributed to that hour. This expense was debited to one of the expense accounts. At the same time, petitioner set up a credit in the same amount in the reserve account which was carried over to the credit side of its balance sheet.

The estimated overhaul expense per flight-hour used to calculate the amounts debited to the expense accounts and credited to the balance sheet accounts for each jet airframe and engine for the years in controversy was based on the terms of the contract between petitioner and TWA. With respect to piston engines, this computation was based on the terms of the contract between petitioner and APS.

The rates specified in the contracts with TWA and APS were determined by dividing the contracting party's estimated cost of an overhaul by the time between overhauls prescribed by the FAA. The estimated cost of an airframe or engine overhaul was based on a cost analysis of each step required by petitioner's FAA-approved maintenance program.

The estimated overhaul expense per flight-hour used to calculate the amounts debited to the expense accounts and credited to the balance sheet accounts for each piston airframe was determined by dividing the estimated cost of an overhaul by the time between overhauls prescribed by the FAA. With respect to the piston airframe leased from E. J. Daly, the amount so computed was specified in the lease agreement.

When an overhaul was performed, the balance sheet reserve account relating to the particular plane was reduced to zero and the expense account was either debited or credited depending upon whether the cost of the overhaul was greater or less than the estimated amount then in the balance sheet reserve account.

Periodically the accounts were adjusted to reflect revised contract rates for overhauls and revised estimates for number of flight-hours between overhauls.

Among the adjustments made was an adjustment in January 1967, to remove $866,934.04 from the reserve for overhaul of jet engines as of December 31, 1966.

On its tax returns filed for each of the years in controversy, petitioner deducted as a cost of operations an amount equal to the aggregate of the net balance (debit) of the expense accounts. The following schedule summarizes the debits and credits made to the "Flight Equipment—Air Worthiness Reserves" account and to the "Direct Maintenance—Flight Air Worthiness Provisions" account during the years in controversy. The portion thereof disallowed by respondent in each year is equal to the net increase in the reserve accounts during the particular year.

SUMMARY OF DEBITS AND CREDITS MADE TO THE BALANCE SHEET ACCOUNTS DURING THE YEARS 1965 AND 1966

Aggregate of Flight Equipment—Air Worthiness Reserve accounts
at Jan. 1, 1965_____ $1, 288, 751

    Amounts debited to the expense accounts during
    the year and credited to the balance sheet
    accounts_____ $2, 168, 962

    Amounts paid for overhauls completed during
    the year and debited to the balance sheet
    accounts_____ (1, 911, 096)

    Debits to balance sheet account for aircraft
    sold prior to overhaul_____ (67, 912)    [2] 189, 954

Aggregate of Flight Equipment—Air Worthiness Reserve accounts at Dec. 31, 1965 [1]_____ 1, 478, 705

    Amounts debited to the expense accounts during
    the year and credited to the balance sheet
    accounts_____ 2, 797, 183

    Amounts paid for overhauls completed during
    the year and debited to the balance sheet
    accounts_____ (1, 923, 159)    [2] 874, 024

Aggregate of Flight Equipment—Air Worthiness Reserve accounts at Dec. 31, 1966 [1]_____ 2, 352, 729

[1] Equal to the total of all the balance sheet accounts for each airframe and engine as listed in column C of the appendix.
[2] Amounts disallowed as deductions by the respondent.

SUMMARY OF DEBITS AND CREDITS MADE TO THE EXPENSE SHEET ACCOUNTS DURING THE YEARS 1965 AND 1966

For the taxable year ended Dec. 31, 1965:

    Aggregate amounts debited to the Direct Main-
    tenance—Air Worthiness Provisions account and
    credited to the balance sheet accounts_____ $2, 168, 962

    Amounts by which the aggregate cost of over-
    hauls completed during the year was less than the
    aggregate amounts accrued in the balance sheet
    accounts at the date of overhaul_____ (54, 350)

    Unaccounted for difference_____ 70

        Deducted on tax return_____ 2, 144, 682

For the taxable year ended Dec. 31, 1966:

    Aggregate amounts debited to the Direct Main-
    tenance—Air Worthiness Provisions account and
    credited to the balance sheet accounts_____ 2, 797, 183

    Aggregate amounts by which the cost of actual
    overhauls completed during the year exceeded
    the aggregate amounts accrued in the balance
    sheet accounts at the date of overhaul_____ 209, 410

    Unaccounted for difference_____ 16, 896

        Deducted on tax return_____ 3, 023, 489

Petitioner, because of its status as a supplemental air carrier, is faced from time to time with a lack of equipment or an excess of equipment. At such times, it either purchases or leases equipment from others or sells or leases equipment to others. Since 1965, petitioner has sold five piston aircraft and one jet aircraft. Four of the piston aircraft were sold at the end of 1969, and a fifth one was sold early in 1970. The jet aircraft was sold early in 1971.

All the piston aircraft owned by petitioner and flown during 1965 and 1966 were sold prior to the time when major airframe overhaul was required.

In the negotiations for the sale of petitioner's aircraft, one of the factors considered in arriving at a sales price for the used airplanes was the accumulated flight time since last overhaul.

From 1950 when petitioner commenced operations to the end of 1971 petitioner had flown approximately 14.2 billion passenger miles. During that time only one piston aircraft has crashed and been destroyed. Petitioner's jet aircraft have been flown 13.5 billion passenger miles without a crash.

OPINION

During 1965 and 1966, petitioner accrued and deducted as an expense a portion of estimated costs for the future overhauls of its aircraft engines and airframes. For every hour flown by one of its aircraft, petitioner allocated an estimated overhaul expense per flight-hour to expense accounts established for each engine and for the airframe. Also, corresponding reserve accounts on the balance sheet were credited with the same amounts debited to the expense accounts.

When an overhaul was performed, the balance sheet liability account relating to the particular airframe or engine was reduced to zero, and the expense account was either debited or credited depending upon whether the cost of the overhaul was greater than or less than the estimated amount then in the balance sheet account. Petitioner deducted as a cost of operation for each taxable year the aggregate of the net amount debited to the expense accounts (and credited to the reserve account) for all airframes and engines for the year.

Respondent disallowed deductions in each year in an amount equal to the net increase in the reserve accounts for airframe and engine overhaul. This had the effect of allowing the deduction of all overhauls performed and charged to the reserve account in each year but of disallowing the deduction of accruals which relate to overhauls which may be performed in future years. The notice of deficiency explains respondents' position as follows:

It is determined that additions to your reserve for air frame and engine overhaul may not be claimed as deductions because all events fixing the liability for

payment have not occurred and the amount thereof cannot be determined with reasonable accuracy.

Section 162 of the Code [1] provides, in general, for the deduction of business expenses such as the overhaul expense: "There shall be allowed as a deduction all the ordinary and necessary expenses paid or incurred during the taxable year in carrying on any trade or business." Such a deduction is to be taken in the taxable year which is proper under the method of accounting used in computing taxable income. Sec. 461(a). For an accrual basis taxpayer such as petitioner, section 1.461-1(a)(2), Income Tax Regs., provides as follows:

(2) *Taxpayer using an accrual method.* Under an accrual method of accounting, an expense is deductible for the taxable year in which all the events have occurred which determine the fact of the liability and the amount thereof can be determined with reasonable accuracy. * * * While no accrual shall be made in any case in which all of the events have not occurred which fix the liability, the fact that the exact amount of the liability which has been incurred cannot be determined will not prevent the accrual within the taxable year of such part thereof as can be computed with reasonable accuracy.

In deciding whether petitioner may accrue and deduct in each of the taxable years a portion of the estimated costs for the future overhauls of its aircraft engines and airframes, we must determine:

(1) Whether all the events have occurred which determine the fact of the liability for the expenses of the overhauls to be performed in future years; and if this question is answered in the affirmative,

(2) Whether the amount of the expenses can be determined with reasonable accuracy.

Petitioner's position is that the deduction of the expenses for overhauls to be performed in the future complies with the statutory requirements. In support of this position, petitioner contends first, that its method of accounting for the cost of overhauls is required by the accounting regulations of the CAB, is consistent with generally accepted accounting principles, and clearly reflects its income. Second, petitioner asserts that its liability for the estimated overhaul costs was fixed and definite at the end of each taxable year because at that time it had a statutory obligation to perform the overhauls in the future and because it was subject to an existing contractual obligation for the payment of such overhaul costs. Third, petitioner maintains that its method of determining the accrual was reasonable and that the accrued expenses were reasonably accurate. Finally, it is argued that the purpose of the "all events" test is satisfied.

We first consider petitioner's assertion that its method of accounting for the cost of the overhauls comports with generally accepted account-

---

[1] Unless otherwise indicated, all statutory references are to the Internal Revenue Code of 1954, as amended, and as in effect during the years involved.

ing principles and clearly reflects income by matching current operating expenses with the revenue produced by such operation. The accrual method of accounting is regularly used by petitioner in keeping its books and in computing income. In general, accrual accounting seeks:

> to enable taxpayers to keep their books and make their returns according to scientific accounting principles, by charging against income earned during the taxable period, the expenses incurred in and properly attributable to the process of earning income during that period; * * * [*United States* v. *Anderson*, 269 U.S. 422, 440 (1926).]

This method of accounting is specifically authorized by Code section 446. That section provides, in part:

SEC. 446. GENERAL RULE FOR METHODS OF ACCOUNTING.

(a) GENERAL RULE.—Taxable income shall be computed under the method of accounting on the basis of which the taxpayer regularly computes his income in keeping his books.

(b) EXCEPTIONS.—If no method of accounting has been regularly used by the taxpayer, or if the method used does not clearly reflect income, the computation of taxable income shall be made under such method as, in the opinion of the Secretary or his delegate, does clearly reflect income.

(c) PERMISSIBLE METHODS.—Subject to the provisions of subsections (a) and (b), a taxpayer may compute taxable income under any of the following methods of accounting—

(1) the cash receipts and disbursements method;
(2) an accrual method;
(3) any other method permitted by this chapter; or
(4) any combination of the foregoing methods permitted under regulations prescribed by the Secretary or his delegate.

See also sec. 1.446–1(a)(2), Income Tax Regs.

Section 446 seemingly reconciles commercial accounting and tax accounting, but this appearance is not the reality. Section 446(b) gives the Commissioner a broad discretion to compute taxable income under a method of accounting which, in his opinion, clearly reflects income. See *Lucas* v. *American Code Co.*, 280 U.S. 445 (1930). In *American Automobile Association* v. *United States*, 367 U.S. 687 (1961), an accrual basis taxpayer sought to prorate membership dues over the 12-month membership period which overlapped 2 tax years. The proration of the prepaid income was based on estimates of future service expenses as reflected by previous experience. The Court held that the accrual basis taxpayer could not defer reporting the prepaid receipts until earned, but rather must include them in income when received. The Court stated that:

> their accounting doubtless presents a rather accurate image of the total financial structure, but fails to respect the criteria of annual tax accounting and may be rejected by the Commissioner.

＊　　　＊　　　＊　　　＊　　　＊　　　＊

This is only to say that in performing the function of business accounting the method employed by the Association "is in accord with generally accepted commercial accounting principles and practices." It is not to hold that for income tax purposes it so clearly reflects income as to be binding on the Treasury. * * * [Fn. omitted. 367 U.S. at 692, 693.]

In *Schlude* v. *Commissioner*, 372 U.S. 128 (1963), the Supreme Court found that the authority of the Commissioner to reject a dance studio's accounting system as not clearly reflecting income and to include advance payments as income in a particular year, was controlled by its decision in *American Automobile Association* v. *United States, supra.* Both *Schlude* and the *American Automobile* cases were concerned with the deferral of income rather than the deduction of estimated future expenses. The same principles of tax accounting and the Commissioner's authority have also been applied, however, to deductions of estimated future expenses. *Commissioner* v. *Milwaukee & Suburban Transport Corp.*, 367 U.S. 906 (1961), involved the deductibility of anticipated damage claims. The Supreme Court remanded that case "in the light" of the *American Automobile* case and *United States* v. *Consolidated Edison Co. of New York, Inc.*, 366 U.S. 380 (1961), and on remand the Court of Appeals for the Seventh Circuit vacated its prior decision permitting the deduction of anticipated damage claims and reinstated the decision of this Court denying such deduction on the authority of the *American Automobile* case. *Milwaukee & Suburban Transport Corp.* v. *Commissioner*, 293 F. 2d 628 (C.A. 7, 1961). See also *Simplified Tax Records, Inc.*, 41 T.C. 75 (1963).

It is now recognized that generally accepted commercial accounting principles may not be acceptable for tax accounting purposes. See also, e.g., *Mooney Aircraft, Inc.* v. *United States*, 420 F. 2d 400 (C.A. 5, 1969). Petitioner must show that, for income tax purposes, its method of accounting complies with the pertinent provisions of the Code. Thus even assuming that petitioner's method of accounting is consistent with generally accepted accounting principles, that fact is not dispositive of the issue before us.

With the distinctions between accounting for tax purposes and for business purposes in mind, we may view with perspective petitioner's argument that the CAB's accounting regulations require the procedures employed by petitioner. 14 C.F.R., part 241.04, sec. 5.4, requires that air carriers account for overhaul costs either by directly expensing the costs at the time of overhaul or by accruing the cost, depending upon which method will "result in an equitable allocation of total maintenance costs as between different accounting periods."

However, these CAB regulations plainly recognize the "differences between income recognized for book purposes and tax purposes." In providing for the accrual of Federal income taxes, the regulations state:

As a general rule the accrual of income taxes on differences between income recognized for book purposes and tax purposes is prohibited. However, Federal income taxes may be deferred for material income differences associated with airworthiness reserve or self-insurance reserve provisions * * * [14 C.F.R., part 241.04, sec. 2–6.]

In addition, the provision describing the reserve accounts used by petitioner provides that:

(7) Material effects upon income taxes resulting from differences as between income recognized for tax and book purposes, associated with accruals to airframe or aircraft engine airworthiness reserves, shall be accounted for in accordance with the instructions for balance sheet account 2340 Deferred Federal Income Taxes. [14 C.F.R., part 241.04, sec. 5–4(g) (7).]

The regulations contain numerous other references to the differences between tax accounting and financial accounting. See, e.g., 14 C.F.R., part 241.04, secs. 2–4(b) and 5–4(g) (8). Furthermore, a waiver from any of the accounting provisions in the regulations may be obtained only if a different procedure, among other things, "will result in a substantially equivalent or more accurate portrayal of operating results or financial condition." 14 C.F.R., part 241.04, sec. 1–2.

It is apparent then, that the accounting procedures required by CAB are designed for financial reporting purposes and to facilitate CAB objectives. The regulations themselves recognize their divergencies from tax accounting and do not pretend to establish practices contrary to or even related to accounting procedures for tax purposes.

Moreover, even if the accounting procedures used by petitioner, with respect to its overhaul costs were required by the CAB, such requirement would not be binding upon the Commissioner or this Court for tax purposes. In *Old Colony R. Co.* v. *Commissioner*, 284 U.S. 552, 562 (1932), the Supreme Court stated:

Moreover, the rules of accounting enforced upon a carrier by the Interstate Commerce Commission are not binding upon the Commissioner, nor may he resort to the rules of that body, made for other purposes, for the determination of tax liability under the revenue acts. * * *

In *National Airlines, Inc.*, 9 T.C. 159, 162 (1947), this Court stated:

That a taxpayer may be required to account one way for one government agency and another way for a different government agency may well be a hardship, and we have no doubt it is, but we are certain that the remedy does not lie with us as a judicial byproduct of a tax determination.

See also *Kansas City Southern Ry. Co.* v. *Commissioner*, 52 F. 2d 372 (C.A. 8, 1931), certiorari denied 284 U.S. 676 (1931) ; *Peoples Bank & Trust Co.*, 50 T.C. 750, 755 (1968), affd. 415 F. 2d 1341 (C.A. 7, 1969) ; *Citizens Federal Savings & Loan Assn. of Covington*, 30 T.C. 285, 294 (1958).

The differences between tax accounting and accounting for commercial purposes were recognized by Congress in 1954,[2] and as a result, sections 452 and 462 were enacted as part of the Code. Section 452 allowed an accrual basis taxpayer to elect to defer the inclusion of prepaid income in gross income until it was earned. Section 462 allowed an accrual basis taxpayer to establish a reserve for estimated future expenses and to deduct a reasonable addition thereto. Because of transitional problems, however, these two sections were retroactively repealed. Act of June 15, 1955, ch. 143, 69 Stat. 134.

These sections would have removed some of the recognized differences between tax accounting and commercial accounting, but the sections were never operative. The repeal of section 462 removed the only provision providing, in general, for the deduction of estimates of expenses to be incurred in the future. While prudent accounting or financial practices may dictate the establishment of reserves for liabilities to be incurred in the future, these reserves are not ordinarily deductible. In *Guardian Investment Corporation* v. *Phinney*, 253 F. 2d 326, 329 (C.A. 5, 1958), the court observed:

Business judgment, supported by conventional commercial accounting practices, may impel a taxpayer to accelerate or defer a deduction from one year to another. Deductions, however, are a matter of legislative grace, and if the Federal Income Tax Law requires a deduction to be placed in a particular compartmented segment, the taxable year in which liability becomes fixed, there it must be placed, neatly or not.

Accordingly, unless a reserve account is specifically authorized by the Code, no deduction will be allowed for amounts set aside to cover a liability not yet incurred.[3] Thus, the mere fact that CAB regulations require the establishment of reserves for overhaul expenses has no material bearing upon the issue here presented.

To be deductible under section 162, an expense must be "paid or incurred" in the taxable year. Amounts set aside as reserves for payment of anticipated future liabilities or contingent expenses cannot be accrued since the liability has not in fact been incurred. *Lucas* v. *American Code Co.*, *supra.* In *United States* v. *Consolidated Edison Co. of N.Y.*, 366 U.S. 380, 384–385 (1961), the Supreme Court stated:

It is settled that each "taxable year" must be treated as a separate unit, and all items of gross income and deduction must be reflected in terms of their posture at the close of such year. * * * neither the Government nor an accrual-basis

---

[2] Congress found dissatisfaction in the fact that "as a result of court decisions and rulings, there have developed many divergencies between the computation of income for tax purposes and income for business purposes as computed under generally accepted accounting principles. The areas of difference are confined almost entirely to questions of when certain types of revenue and expenses should be taken into account in arriving at net income." House Ways and Means Committee report, H. Rept. No. 1337, 83d Cong., 2d Sess. (1954), 3 U.S. Code Cong. & Adm. News 4073–4074 (1954).

[3] A reserve for bad debts, for example, is specifically authorized by sec. 166.

taxpayer may cause an item to be deducted in a year other than the one in which it accrued. * * * the "touchstone" for determining the year in which an item of deduction accrues is the "all events" test established by this Court in *United States* v. *Anderson, supra* [269 U.S. 422], and since reaffirmed by this Court on numerous occasions, so that it is now a fundamental principle of tax accounting. * * * [Fn. omitted.]

The "all events" test, first articulated in *United States* v. *Anderson, supra*, was subsequently incorporated into the Income Tax Regulations. As regulation 1.461–1(a)(2) and court decisions make plain, the test includes two requirements, and each requirement must be met in the taxable year for which the deduction is sought. *Thriftimart, Inc.*, 59 T.C. 598 (1973) (appeal pending C.A. 9, Sept. 21, 1973). We therefore turn to consideration of whether the disallowed overhaul expenses were "incurred" by petitioner in the years for which their deduction is sought herein.

The first requirement for the accrual of an expense in a taxable year is that "all of the events have occurred which determine the fact of the liability." The purpose of this requirement is to protect tax revenues by insuring that a taxpayer will not take deductions for expenditures that might never occur. *Mooney Aircraft, Inc.* v. *United States, supra.* Consistent with this purpose, it has been noted that "As a general rule the existence of a contingency in the taxable year with respect to a liability or its enforcement prevents accrual. Accrual of a deduction item is permitted only in the taxable year when the obligation to pay it is unconditionally fixed." *Trinity Construction Co.* v. *United States*, 424 F. 2d 302, 305 (C.A. 5, 1970); see also *Brown* v. *Helvering*, 291 U.S. 193 (1934); *Security Flour Mills Co.* v. *Commissioner*, 321 U.S. 281 (1944).

In contending that the claimed expenses met the first requirement of the "all events" test in the taxable years, petitioner first asserts that with respect to practically all of its airframes and engines, at the end of each taxable year it was subject to an existing contractual obligation for payment of the accrued overhaul costs. We think it clear, however, that there is no merit to this contention. While contracts with TWA and APS did exist during the relevant years, these contracts merely obligated TWA and APS to perform the overhauls at the appropriate future date and specified an overhaul expense per flight-hour to be used in computing the initial payment.

Petitioner was under no obligation to make any payment unless an overhaul was actually performed. The amounts accrued in the reserve accounts (and disallowed by respondent in each year) would not be due and payable to TWA and APS until a future date. Petitioner's witness so interpreted the contracts. These contracts did not fix the fact of petitioner's liability for the amounts accrued.

Petitioner next argues that at the end of each taxable year, it had a statutory obligation to perform overhauls in the future which would require the expenditure of funds. Support for this proposition is sought in *Denise Coal Co.* v. *Commissioner*, 271 F. 2d 930 (C.A. 3, 1959), affirming in part and reversing in part 29 T.C. 528 (1957); *Harrold* v. *Commissioner*, 192 F. 2d 1002 (C.A. 4, 1951), reversing and remanding 16 T.C. 134 (1951); *Pacific Grape Prod. Co.* v. *Commissioner*, 219 F. 2d 862 (C.A. 9, 1955), reversing and remanding 17 T.C. 1097 (1952). But these cases are distinguishable on their facts from the instant situation. In both *Denise* and *Harrold* the taxpayers were engaged in strip mining. Applicable State laws required that the stripped land must be restored after the completion of the mining process. The taxpayers accrued and deducted the estimated expenses of rehabilitating the land on which mining operations had been completed. The accruals were allowed because in the taxable years in which the deductions were taken, there had occurred all the *operative* facts giving rise to the obligation to restore the stripped land.

In the instant situation, however, petitioner seeks to accrue expenses for overhauls which will occur in future taxable years. Until an airframe or engine has flown the applicable number of flight-hours, no obligation to overhaul arises. Thus in the taxable years for which the accrued expenses were deducted, the *operative* facts had not occurred and petitioner's liability for the overhaul costs had not become fixed.

*Pacific Grape Prod. Co.* is also inapposite to petitioner's circumstances. During the taxable years in that case, the taxpayer sold certain goods, the title to which passed to the buyer. The taxpayer became obligated in the taxable year to ship the goods to the buyer. The taxpayer's liability for the shipping expenses became fixed in the taxable years, and the accrual of those expenses was allowed. See *Simplified Tax Records, Inc.*, 41 T.C. 75, 82 (1963); 1 Surrey, Federal Income Tax 720-722.

Petitioner also argues that the accrual of the expenses satisfied the purpose of the "all events" test. Integral to this argument is the contention that there are no sufficiently real or substantial contingencies which might relieve petitioner of its liability and thus there is little possibility that petitioner will take a deduction for an expense that will never occur. Petitioner maintains that any contingencies relating to liability are "conditions subsequent" in that they would defeat liability only after the year of accrual.

Petitioner's argument assumes that liability is fixed in the year of accrual. The pertinent question is not whether the contingency defeating liability occurs after the year of accrual, but whether it occurs after the time when liability is fixed. The term "condition subsequent" refers to an occurrence which might diminish or terminate an existing

liability. Such a contingency would not necessarily prevent a fixed liability from being properly accrued. *Wien Consolidated Airlines, Inc.*, 60 T.C. 13 (1973), on appeal (C.A. 9, Dec. 21, 1973).

The bankruptcy of petitioner or the crash or permanent grounding of an aircraft might conceivably relieve petitioner of the payment of overhaul costs. The occurrences of any of these contingencies, however, would not relieve petitioner of an *existing* obligation to pay any overhaul costs. Rather, the occurrence would mean that no obligation to pay would ever come into existence. Petitioner has not shown that its liability for the accrued overhaul costs was absolutely fixed in the year of accrual. The contingencies referred to would act to prevent a potential liability from coming into existence. Hence, the contingencies are not "conditions subsequent" as petitioner suggests.

While the contingencies mentioned above are perhaps remote, there exists another contingency whose occurrence is not unlikely. Petitioner has sold five piston aircraft and one jet aircraft since 1965. The five piston aircraft owned by petitioner during 1965 and 1966 were sold prior to the time when major airframe overhaul was required. Petitioner contends that the fact that an aircraft was sold prior to the time an overhaul was required and prior to the time it was actually required to pay for overhaul costs did not prevent the accrual of the estimated overhaul costs. In support of this contention, petitioner offered the testimony of the official having charge of buying, selling, and leasing of aircraft for petitioner to the effect that in every instance when an aircraft was sold by petitioner the sales price was determined by reducing the normal market value of a comparable, newly overhauled aircraft by the amount of the estimated overhaul expense accrued to the date of sale on the particular plane being sold. Petitioner argues that "Since the sales price is reduced by the amount of the accrued estimated overhaul expense, petitioner has in effect 'paid' the accrued amount." We do not agree.

The simple answer to this argument is the fact that petitioner had not incurred any liability for overhaul costs at the time either of the aircraft was sold. Undoubtedly, the physical condition of each aircraft at the time of sale, as well as the number of flight-hours left before an engine or airframe overhaul would be required under the CAB regulations, were factors taken into consideration by both the petitioner and the purchaser in their negotiation of the sale price. The mere use of the aircraft, however, did not bring into existence a matured obligation. Consequently, the reduction in the sale price did not represent the payment of an existing fixed liability. Regardless of whether the aircraft is sold or overhauled, petitioner must look to an event subsequent to the year of accrual in order finally to fix the liability.

We do not agree with petitioner that accrual of the estimated future overhaul costs satisfied the purpose of the "all events" test. That test is designed to assure that taxpayers will not obtain deductions for expenditures that might never occur. The test seeks certainty of liability rather than probability. *Brown* v. *Helvering, supra* at 201.

Having carefully reviewed all the evidence and given due consideration to the various arguments presented on brief by counsel for each of the parties, we conclude that petitioner has not established that during the taxable years the accrued overhaul costs were fixed liabilities within the meaning of the "all events" test. Since petitioner has failed to meet the first requirement of the test, we find it unnecessary to consider whether, at the end of each taxable year, petitioner was able to determine with reasonable accuracy the cost of the anticipated overhauls to be made in the future years. *Crescent Wharf & Warehouse Co.*, 59 T.C. 751 (1973) (on appeal C.A. 9 (May 29, 1973)).

Finally, and perhaps a more compelling reason why the petitioner is not entitled to deduct the estimated future overhaul expenses, is the fact that such expenses were not a part of the *operative* expenses incurred in the *process of earning* the income received during the taxable years. The expenses accrued were estimates of expenses expected to be incurred in future years which would enable or permit petitioner to earn similar income in the future. They were not required or necessary in the earning of the income in the taxable years and were therefore not expenses "paid or incurred" during the taxable years in carrying on petitioner's trade or business, within the provisions of section 162.

On the facts presented and for the reasons hereinabove discussed we hold that petitioner may not accrue and deduct any portion of the estimated costs for the future overhauls of its aircraft engines and airframes.

## 2. *Issue re Investment Credit*

### FINDINGS OF FACTS

On August 15, 1966, petitioner submitted a sealed bid for the lease of an Aero Commander Jet Aircraft to the Federal Aviation Administration. The bid was submitted on a Federal standard form invitation to bid which, upon acceptance by the FAA, would become the lease contract. Petitioner's bid was accepted on August 26, 1966.

On August 31, 1966, petitioner purchased an Aero Commander Jet Aircraft for $786,397.97 in order to perform on the contract. The aircraft was delivered to the FAA on September 6, 1966, the commencement date of the lease contract.

The contract period was to continue for 1 year, subject to the availability of funds. The aircraft was to be furnished to the Government

on an hourly flight rate basis with a minimum use guarantee of 500 flight-hours. The Government estimated that the aircraft would be used for 650 flight-hours during the contract period.

The contract specified that petitioner would furnish the aircraft to the Government at a rate of $315 per flight-hour for the guaranteed minimum 500 flight-hours. Petitioner further specified that a rate of $53 would be charged for the estimated flight-hours in excess of the guarantee. Petitioner was therefore guaranteed $157,500 under the contract.

During the contract period, the FAA implemented the contract by issuing, from time to time, purchase orders which stated a period of time during which the aircraft would be used and indicated the number of flight-hours to be accumulated during that time. The orders provided for FAA payment, in accordance with the contract, for the flight-hours accumulated during the relevant period. The first purchase order covered the period from September 6, 1966, to December 31, 1966, and specified 200 hours of flight time. On December 20, 1966, a second purchase order extended the original period of use to March 31, 1967, and indicated that a total of 350 flight-hours would be accumulated through the extended period. On March 29, 1967, a purchase order issued to extend the period of use to June 30, 1967, at which time the guaranteed 500 flight-hours would be accumulated. On July 5, 1967, a purchase order issued extending the period of use to July 31, 1967. This order indicated that 24 flight-hours would be flown at an hourly rate of $315 and that 13 flight-hours would be flown at an hourly rate of $53. On August 4, 1967, a final purchase order extended the period of use through September 5, 1967, and indicated that a total of 78 flight-hours would be accumulated at the rate of $53 per flight-hour.

A resolution passed at a meeting of petitioner's board of directors described the transaction as follows:

The Chairman reported that the Company was the successful bidder on a one-year contract * * *. In order to perform this lease agreement, the Company purchased from Western Commander, Inc. of Santa Monica, California on August 31, 1966, one (1) Aero Commander Jet Aircraft * * *. The aircraft is available to the Company for use when it is not in use by the FAA (Friday evening through Monday morning) and the Company intends to develop further use of the aircraft for executive charter work. Although a renewal of the lease is likely, subject to competitive bidding, the Company is giving consideration to the use of the aircraft in corporate executive charter work. The Chairman stated that he regarded the investment as a favorable one and expressed the opinion that the value of the aircraft after the end of the first year's lease would exceed the amount of the Company's remaining investment in the aircraft.

The contract between petitioner and the FAA, as implemented by the purchase orders, was a 1-year contract. Pursuant to the contract,

petitioner received $157,500 for the 500 hours of minimum use and an additional amount of at least $4,134 for the flight-hours in excess of the minimum.

Upon termination of the original 1-year lease, petitioner was required to submit another bid in order to be considered for any further lease award. A bid was submitted to the FAA on August 4, 1967, and on September 6, 1967, petitioner was awarded another 1-year lease, subject to the availability of funds. This lease period ended September 5, 1968, and petitioner received $164,754 under this contract.

In July 1968, petitioner again bid on the FAA contract and on September 13, 1968, was awarded a third 1-year lease, subject to the availability of funds. Under this contract, petitioner received at least $179,000.

In July or August of 1969, petitioner submitted a bid to the FAA but was not the successful bidder for an additional lease.

The Aero Commander Aircraft had a useful business life of not less than 12 years and for financial reporting purposes was depreciated on a straight-line basis over 12 years to 15-percent salvage value. For Federal income tax purposes, the aircraft was depreciated over a period of 6 years beginning in 1966, in accordance with the double-declining-balance method established by Rev. Proc. 62-21, 1962-2 C.B. 418.

OPINION

On August 31, 1966, petitioner purchased a jet aircraft and leased it to the FAA for 1 year beginning on September 6, 1966. The aircraft was tangible personal property which was depreciable and which had a useful life of not less than 12 years. Petitioner expended $786,397.97 on the aircraft. Petitioner placed the aircraft in service in 1966, and claimed the full 7-percent credit on the investment in the taxable year ending December 31, 1966. Respondent disallowed the investment credit on the ground that the aircraft was leased to an agency of the Federal Government.

Sections 38 and 46 of the Code [4] provide that a taxpayer shall be allowed as a credit against the income tax, a specified percentage

---

[4] SEC. 38. INVESTMENT IN CERTAIN DEPRECIABLE PROPERTY.

(a) GENERAL RULE.—There shall be allowed, as a credit against the tax imposed by this chapter, the amount determined under subpart B of this part.

(b) REGULATIONS.—The Secretary or his delegate shall prescribe such regulations as may be necessary to carry out the purposes of this section and subpart B.

SEC. 46. AMOUNT OF CREDIT.

(a) DETERMINATION OF AMOUNT.—

(1) GENERAL RULE.—The amount of the credit allowed by section 38 for the taxable year shall be equal to 7 percent of the qualified investment (as defined in subsection (c)).

*       *       *       *       *       *       *

of the cost basis of qualified property which is placed in service [5] by the taxpayer during the taxable year. Property which qualifies for the credit is known as "section 38 property" and is defined by section 48.[6]

In addition to defining section 38 property in general, section 48(a) contains several provisions specifically excluding from section 38 status certain property which otherwise might qualify. Section 48(a) (5) provides that "Property used by the United States, any State or political subdivision thereof, any international organization * * * or any agency or instrumentality of any of the foregoing shall not be treated as section 38 property." The regulations under section 48(a)(5) provide that the term "property used by the United States, etc." means property leased to any such governmental unit but this provision does "not apply to property leased on a casual or short-term basis to any such governmental unit." Sec. 1.48–1(k), Income Tax Regs.

---

(c) QUALIFIED INVESTMENT.—

(1) IN GENERAL.—For purposes of this subpart, the term "qualified investment" means, with respect to any taxable year, the aggregate of—

(A) the applicable percentage of the basis of each new section 38 property (as defined in section 48(b)) placed in service by the taxpayer during such taxable year, plus

(B) the applicable percentage of the cost of each used section 38 property (as defined in section 48(c)(1)) placed in service by the taxpayer during such taxable year.

(2) APPLICABLE PERCENTAGE.—For purposes of paragraph (1), the applicable percentage for any property shall be determined under the following table:

| If the useful life is— | The applicable percentage is— |
|---|---|
| 3 years or more but less than 5 years | 33⅓ |
| 5 years or more but less than 7 years | 66⅔ |
| 7 years or more | 100 |

For purposes of this subpart, the useful life of any property shall be the useful life used in computing the allowance for depreciation under section 167 for the taxable year in which the property is placed in service.

[5] Sec. 1.46–3(d), Income Tax Regs., provides, in part:

Sec. 1.46–3 Qualified Investment.

(d) *Placed in service.* (1) For purposes of the credit allowed by section 38, property shall be considered placed in service in the earlier of the following taxable years:

(i) The taxable year in which, under the taxpayer's depreciation practice, the period for depreciation with respect to such property begins; or

(ii) The taxable year in which the property is placed in a condition or state of readiness and availability for a specifically assigned function, whether in a trade or business, in the production of income, in a tax-exempt activity, or in a personal activity.

[6] That section provides, in part:

SEC. 48. DEFINITIONS; SPECIAL RULES.

(a) SECTION 38 PROPERTY.—

(1) IN GENERAL.—Except as provided in this subsection, the term "section 38 property" means—

(A) tangible personal property, or

(B) other tangible property (not including a building and its structural components) but only if such property—

(i) is used as an integral part of manufacturing, production, or extraction or

The ultimate question presented is whether the jet aircraft leased to the FAA for 1 year was property used by an agency or instrumentality of the United States within the meaning of section 48(a)(5). In resolving this issue we must determine whether the lease involved was "casual or short-term."

The determination of whether property qualifies as section 38 property must be made with respect to the year in which the property is placed in service. Section 1.46–3(d)(4)(i), Income Tax Regs., provides:

(4)(i) The credit allowed by section 38 with respect to any property shall be allowed only for the first taxable year in which such property is placed in service by the taxpayer. The determination of whether property is section 38 property in the hands of the taxpayer shall be made with respect to such first taxable year. Thus, if a taxpayer places property in service in a taxable year and such property does not qualify as section 38 property (or only a portion of such property qualifies as section 38 property) in such year, no credit (or a credit only as to the portion which qualifies in such year) shall be allowed to the taxpayer with respect to such property notwithstanding that such property (or a greater portion of such property) qualifies as section 38 property in a subsequent taxable year. For example, if a taxpayer places property in service in 1963 and uses the property entirely for personal purposes in such year, but in 1964 begins using the property in a trade or business, no credit is allowable to the taxpayer under section 38 with respect to such property. See § 1.48–1 for the definition of section 38 property.

Thus, in 1966, the aircraft must meet all the definitional requirements specified in section 48. And similarly, in 1966, the aircraft

of furnishing transportation, communications, electrical energy, gas, water, or sewage disposal services, or

(ii) constitutes a research facility used in connection with any of the activities referred to in clause (1), or

\* \* \* \* \* \* \*

Such term includes only property with respect to which depreciation (or amortization in lieu of depreciation) is allowable and having a-useful life (determined as of the time such property is placed in service) of 3 years or more.

(2) PROPERTY USED OUTSIDE THE UNITED STATES.—

(A) IN GENERAL.—Except as provided in subparagraph (B), the term "section 38 property" does not include property which is used predominantly outside the United States.

\* \* \* \* \* \* \*

(3) PROPERTY USED FOR LODGING.—Property which is used predominantly to furnish lodging or in connection with the furnishing of lodging shall not be treated as section 38 property. \* \* \*

\* \* \* \* \* \* \*

(4) PROPERTY USED BY CERTAIN TAX-EXEMPT ORGANIZATIONS.—Property used by an organization (other than a cooperative described in section 521) which is exempt from the tax imposed by this chapter shall be treated as section 38 property only if such property is used predominantly in an unrelated trade or business the income of which is subject to tax under section 511. \* \* \*

(5) PROPERTY USED BY GOVERNMENTAL UNITS.—Property used by the United States, any State or political subdivision thereof, any international organization (other than the International Telecommunications Satellite Consortium or any successor organization), or any agency or instrumentality of any of the foregoing shall not be treated as section 38 property.

must not fall within any of the categories of property specifically excluded from qualifying as section 38 property.

Petitioner contends that the credit should be allowed because the lease to the FAA was "short-term" and thus the aircraft is not within the section 48(a)(5) exclusion. It is argued that a 1-year lease is "short-term" when compared to the entire useful life of the aircraft. Petitioner maintains that the investment credit was enacted to spur investment by the private sector and that the tax incentive is needed to encourage investment unless a taxpayer is assured that a Government agency will lease the property for all or a substantial portion of the useful life of the property. Petitioner's position is that if the Government lease is for only a small part of the useful life of the property, then the taxpayer can be assured of the return of only a small part of his investment from this source and accordingly, is entitled to the credit because of the extensive private use and risk.

Respondent, on the other hand, contends that a 1-year lease is not so insubstantial that it may be considered "short-term" under the regulations. It is said that "short-term" refers to a de minimis type of situation in which Government use is only minimal. Respondent further maintains that because the aircraft was purchased specifically for Government use, the lease was not "casual" within the meaning of the regulations.

We conclude that the 1-year lease to the FAA was not casual or short-term, and therefore, the aircraft was property used by an agency of the United States.

In resolving the issue, we find it helpful to evaluate petitioner's argument. The underpinning of this argument is the premise that, in determining whether the lease is short-term, the relevant consideration is whether the nonqualifying Government use constitutes a substantial portion of the useful life of the property. Consistent with this view, petitioner asserts that even if the leases obtained in 1967 and 1968 were "tacked on" to the initial 1-year lease, that the resulting 3-year lease would not be "long-term" when compared to the useful life of the aircraft. Under this view, if the aircraft were placed in service for 1 year (or 3 years) in the nonqualifying use, the aircraft should still be considered as section 38 property during the first taxable year. We are compelled to reject petitioner's analysis.

The phrase "casual or short-term lease" is not defined in the regulations. Petitioner seeks to define "short-term lease" by viewing that provision in isolation and only in relation to the ultimate objective of the investment credit. We think, however, that a different focus is

required. The phrase is susceptible to a more precise understanding when considered in context with the provisions of section 48(a). The regulation indicates that a "casual or short-term" lease to the Government will not mean that the property involved is "used by the United States" within the meaning of Code section 48(a)(5). Consequently, "casual or short-term" must be considered in relation to the meaning of "used" in section 48(a)(5).

Before defining the term "used by the United States, etc.," we compare that phrase to the language of other exclusionary provisions in section 48(a). Section 48(a)(2) provides that section 38 property does not include property which is "used *predominantly* outside the United States." (Emphasis supplied.) Section 48(a)(3) provides that property which is "used *predominantly* to furnish lodging" (Emphasis supplied) shall not be treated as section 38 property. Section 48(a)(4) provides that property used by an exempt organization shall be treated as section 38 property only if such property is "used *predominantly* in an unrelated trade or business." (Emphasis supplied.) On the other hand, section 48(a)(5) provides only that property "used by the United States" shall not be treated as section 38 property.

We cannot conclude that Congress inadvertently failed to use "predominantly" in section 48(a)(5) since a predominant-use test is provided for elsewhere in the section. *Northville Dock Corp.*, 52 T.C. 68, 75 (1969), affd. 427 F. 2d 164 (C.A. 2, 1970). The only reasonable conclusion is that section 48 embodies a "predominant use" test and a "use" test and that different amounts of use in the prescribed activities operate to exclude property from qualifying as section 38 property.[7] It is apparent that the provisions specifying a predominant-use test explicitly authorize a substantial amount of use in the disfavored activities. And it is equally clear that section 48(a)(5) provides for less use in the activities it concerns. To understand the amount of governmental use possibly allowable under section 48(a)(5), it is therefore instructive to determine the limits of the predominant-use provisions.

---

[7] The distinctions between "use" and "predominant use" were recognized in *Northville Dock Corp.*, 52 T.C. 68, 75 (1969), affd. 427 F. 2d 164 (C.A. 2, 1970). There the taxpayer claimed an investment credit for an oil storage tank. Sec. 48(a)(1)(B) provided that sec. 38 property meant tangible property if such property constituted a storage facility "used in connection with" manufacturing, production, etc. Relying upon a revenue ruling, respondent contended that the storage facilities must be "predominantly used" to store the refineries' oil. The Court found that while the tank was "substantially used" by various oil refineries in connection with their refining process, it was not predominantly used in that manner. The Court held that "used" does not require a predominant use, and stated that since the tank was substantially used in the prescribed manner, it was unnecessary to determine whether the use need be more than de minimis. See also *Sherley-Anderson-Rhea Elevator, Inc.* v. *United States*, 315 F. Supp. 1055 (N.D. Tex. 1970).

The regulations under section 48(a)(2) clearly define predominant use:

If the property is physically located outside the United States during more than 50 percent of the taxable year, such property shall be considered used predominantly outside the United States during that year. If property is placed in service after the first day of the taxable year, the determination of whether such property is physically located outside the United States during more than 50 percent of the taxable year shall be made with respect to the period beginning on the date on which the property is placed in service and ending on the last day of such taxable year.

Sec. 1.48-1(g)(1)(i), Income Tax Regs. That regulation further states:

(ii) Since the determination of whether a credit is allowable to the taxpayer with respect to any property may be made only with respect to the taxable year in which the property is placed in service by the taxpayer, *property used predominantly outside the United States during the taxable year in which it is placed in service cannot qualify as section 38 property with respect to such taxpayer, regardless of the fact that the property is permanently returned to the United States in a later year.* * * * [Emphasis supplied.]

Thus the predominant-use test looks to the taxable year (or part thereof) in which the property is placed in service as the relevant period for determining whether the use of the property disqualifies it as section 38 property. And predominant use means over 50 percent of the relevant period. See also S. Rept. No. 1881, 87th Cong., 2d Sess. (1962), 1962-3 C.B. 860. By looking to the first taxable year (or part thereof), the test seeks certainty in the characterization of property. It is quite plain that the test does not consider the use of the property in the first taxable year in relation to the useful life of the property. If the use of property disqualifies it as section 38 property during the first taxable year, then it is irrelevant how the property might be used in later years of its useful life. Under the predominant-use test, a 1-year use of property in a nonqualifying manner would necessarily disqualify the property as section 38 property.

Similarly, section 1.48-1(h), Income Tax Regs., which relates to the lodging exclusion, indicates that the relevant period of use is the taxable year in which the property is placed in service and that "predominantly" means "more than one-half." See also S. Rept. No. 1881, 87th Cong., 2d Sess. (1962), 1962-3 C.B. 861. The regulation under section 48(a)(4) does not repeat the detailed explanation of the regulations under section 48(a)(2), (3)

While "predominant-use" is clearly explained, the regulations under section 48(a)(5) do not explicitly define "use." But by its words, section 48(a)(5) does not authorize the substantial amount of nonqualifying use permitted in the "predominant-use" situation. Since a 1-year use in a nonqualifying manner would necessarily constitute

a predominant use, it follows that a 1-year lease constitutes "use" within the meaning of section 48(a)(5).[8]

Petitioner's view of a short-term lease is totally alien to the concepts expressed in the investment credit provisions. Petitioner would have us compare the length of the nonqualifying use to the entire useful life of the property, and under this view, a 1-year (or 3-year) use in a nonqualifying activity would not result in disqualification of the property. But this approach would allow substantially more nonqualifying use than the permissive predominant-use test. Such an approach has no support whatever in the Code, the regulations, or in the legislative history of the relevant provisions. The application of this approach to defining "short-term lease" would result in a significant distortion of the plain words of section 48(a)(5). We are compelled to conclude, therefore, that the 1-year lease to the FAA constituted a use of the aircraft by an agency of the United States within the meaning of section 48(a)(5).

Because we have determined that a 1-year lease of the aircraft necessarily means that the property was "used by the United States," it is clear that the "short-term lease" provision in the regulations cannot be applicable here. We need not attempt to draw the fine line between short-term and that which is not short-term. For our purposes here, we need only determine that the lease does not come within the exception to "used by the United States, etc.," which is provided for in the regulations. Accordingly, we hold that respondent properly disallowed the investment credit for the aircraft in 1966.

*Decision will be entered under Rule 155.*

---

[8] It is pertinent to note that the aircraft was placed in service after the beginning of the taxable year ending Dec. 31, 1966. The aircraft was leased to the Government for the entire past year. Sec. 1.48–1(g)(1)(i), Income Tax Regs., indicates that under the provisions embodying a predominant-use test, a nonqualifying use for more than 50 percent of the past year would constitute a predominant use in the first taxable year. While we do not dispose of the issue here on this basis, we note that the regulation under sec. 48(a)(5) does not indicate that a use could be short-term when the property is used by the Government for the entire past year.