DOUGLAS J. LEMERY AND MARGUERITE H. LEMERY, PETITIONERS *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

RAYMOND J. LEMERY AND MYRTLE LEMERY, PETITIONERS *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket Nos. 3052-64, 3053-64. Filed June 4, 1969.

*Warren V. Clodfelter* and *Richard F. Kroetch*, for the petitioners. *Merritt S. Yoelin*, for the respondent.

## OPINION

Section 1374 of subchapter S of the Internal Revenue Code of 1954 provides that a shareholder of an electing small business corporation shall be allowed a deduction from gross income for his taxable year in which the taxable year of the corporation ends, in an amount equal to his portion of the corporation's net operating loss.

The petitioners, Raymond and Douglas Lemery, as shareholders of Palms Motel, Inc., an electing small business corporation engaged in the business of operating a motor hotel, each claimed a deduction on his return for the taxable year 1960, for his respective share of the net operating loss reported by Palms Motel, Inc., for its fiscal year ended March 31, 1960. The respondent determined that the deduction claimed by the corporation for amortization of a covenant not to compete was not allowable and increased the taxable income of each of the petitioners by the share of the disallowed amortization de-

duction allocated to him. In the statement attached to the notice of deficiency, the adjustment was explained as follows:

It is determined that the claimed deduction in the amount of $40,000 for amortization of a covenant not to compete is disallowed because you failed to establish—

(A) That any value attaches to the covenant

(B) The fact of liability

(C) That it is an ordinary and necessary expense, reasonable in amount.

The only question to be determined is whether a covenant not to compete which was given by the vendor to the purchasers of all the stock of Palms Motel, Inc., and two other corporations and assigned by the purchasers to Palms Motel, Inc., was amortizable.

On August 23, 1958, Raymond J. Lemery, acting for himself, Douglas J. Lemery, and Floyd R. Clodfelter, acquired from Thomas E. Mugleston, a citizen and resident of Canada, all the outstanding stock of three Oregon corporations known as Palms Motel, Inc., Palms Lounge, Inc., and Windsor Laundry, Inc. The total purchase price for the stock of all three corporations was $1,131,000, of which the purchaser paid $40,000 in cash ($10,000 on execution of the purchase agreement and $30,000 on December 15, 1958) and assumed certain mortgages and other obligations owed by Palms Motel, Inc., and Palms Lounge, Inc., the outstanding balances of which aggregated $646,664.83, payable in monthly installments, including interest, aggregating $9,458.10. The balance of the purchase price amounting to $444,335.17 was to be paid by the purchaser from the "net profit" of the three corporations computed at the end of each 6-month period. "Net Profit" was defined to mean all of the gross income of the companies, less ordinary and proper expenses, a management fee, principal and interest on the mortgages and other obligations of the corporations, and income taxes payable by the companies, but without provision for depreciation of the assets.

The stock purchase agreement contained a covenant that, for a period of 5 years, the vendor would not compete with the business of any of the companies within 10 miles of the city limits of Portland and provided that $200,000 of the purchase price of the shares being sold should apply to this covenant. On September 10, 1958, Raymond assigned the "covenant not to compete" to Palms Motel, Inc., in consideration of the corporation assuming and agreeing to pay Mugleston the sum of $200,000 in accordance with the terms of the contract of August 23, 1958.

A covenant not to compete with the buyer of a business usually presents conflicting interests, taxwise, as between buyer and seller, in negotiating the price. The vendor, who is selling a capital asset, usually prefers a low price as the amount so allocated is taxable to him as ordinary income rather than capital gain. The buyer prefers to allocate

a high price to the covenant as a basis for amortization deductions. *Balthrope* v. *Commissioner*, 356 F. 2d 28 (C.A. 5, 1966), affirming a Memorandum Opinion of this Court.

The courts may look beyond the form of the contract to see whether the apparent agreement has substance. *Annabelle Candy Co.* v. *Commissioner*, 314 F. 2d 1 (C.A. 9, 1962), affirming a Memorandum Opinion of this Court; *United Finance & Thrift Corporation of Tulsa*, 31 T.C. 278 (1958), aff'd. 282 F. 2d 919 (C.A. 4, 1960) ; *Schulz* v. *Commissioner*, 294 F. 2d 52 (C.A. 9, 1961), affirming 34 T.C. 235 (1960).

In the *Schulz* case, the buyers and the seller were petitioners with opposing interests. The buyers were aware that the seller had no intention of competing. The Tax Court found that the covenant asked for by the buying partners from the selling member of a partnership was not, in the circumstances there present, important, meaningful, or valuable, and represented capital gain to the selling partner and unamortizable, nondeductible, capital expenditures to the buyers. In affirming, the United States Court of Appeals commented "We think that the covenant must have some independent basis in fact or some arguable relationship with business reality such that reasonable men, genuinely concerned with their economic future, might bargain for such an agreement." 294 F. 2d at 55.

Respondent's principal contention is that the "covenant not to compete" is not amortizable for the reason that it did not result from true arm's-length bargaining between the buyer and the seller and that it lacked any independent basis or arguable relationship with business reality which would cause either the buyer or the seller to bargain for it, since the seller maintained a direct financial interest in the business during the life of the covenant. Petitioners contend that the inclusion of the amount in the stock purchase agreement was negotiated for between the buyer and seller, and that the possibility of competition from Mugleston was real.

Before considering whether the covenant not to compete was actually bargained for or bore any arguable relationship with business reality, it should be pointed out that, although a factor to be considered, the fact that the contract assigned a specific amount as the value of the covenant is not controlling. In *Wilson Athletic Goods Mfg. Co.* v. *Commissioner*, 222 F. 2d 355 (C.A. 7, 1955), reversing a Memorandum Opinion of this Court on other grounds, the U.S. Court of Appeals for the Seventh Circuit stated :

But in tax matters we are not bound by the strict terms of the agreement; we must examine the circumstances to determine the actualities and may sustain or disregard the effect of a written provision, or of an omission of a provision, if to do so best serves the purposes of the tax statute. Higgins v. Smith, 308 U.S. 473 * * *

The Court further stated: "Consequently, it is immaterial whether the contract did or did not define a specified amount as the value of the covenant." [2] In addition, any significance that might have attached to the statement of the value of the covenant in the contract was considerably weakened, if not eliminated in the present case, by reason of the fact that no allocation was made of either the $1,131,000 purchase price or the $200,000 assigned to the covenant, as between the three companies whose stock was being purchased.

The only evidence relating to negotiations for the covenant not to compete is the uncorroborated testimony of Raymond Lemery that it was actually negotiated for. His explanation of why the covenant was included in the stock purchase agreement does not support his statement. He testified he had previously sold a chain saw business in Canada in connection with which the buyer had required a covenant not to compete and he thought this was a good thing and "demanded" such a covenant in the stock purchase agreement. He was unable to recall any remarks made by Mugleston concerning this "demand". Neither Mugleston nor Floyd Clodfelter, who accompanied Raymond on his visit with Mugleston, was called as a witness by petitioners although they had sought and been granted a continuance from an earlier trial setting on the ground that Mugleston's testimony was of major importance and he was not available at that time. Their failure to obtain Mugleston's testimony raises the inference that his testimony would not have supported petitioners' contentions. *O. H. Kruse Grain & Milling* v. *Commissioner*, 279 F. 2d 123 (C.A. 9, 1960), affirming a Memorandum Opinion of this Court. Moreover, since Mugleston had held the stock of the three companies for less than 6 months, it was immaterial to him, taxwise, whether his profit from the sale be considered as consideration for a covenant not to compete or short-term capital gain. Thus, there was absent any genuine concern for tax consequences which would have caused him to "bargain" for the amount ascribed to the covenant not to compete. Raymond's testimony as to how the stated purchase price of $1,131,000 and the $200,000 assigned to the covenant were arrived at was so uncertain and inconclusive as to suggest that the $200,000 figure was in fact "carved out" after the total purchase price had been agreed upon. See *George H. Payne*, 22 T.C. 526 (1954). Cf. *Howard Construction, Inc.*, 43 T.C. 343 (1964).

We find and hold that neither the "covenant not to compete," which is set forth in the stock purchase agreement dated August 23, 1958, nor the amount allocated thereto was separately bargained for.

It is also evident that the covenant not to compete had no basis in fact or arguable relationship with business reality. Of the total purchase

---

[2] Similar views were expressed by this Court in its Memorandum Opinion filed Sept. 29, 1954 (T.C. Memo 1954–163).

price of $1,131,000, petitioners paid only $40,000 in cash and assumed the payment of certain mortgages and other obligations, the outstanding balances of which aggregated $646,664.83, payable in monthly installments aggregating $9,458.10. The balance of the purchase price amounting to $444,335.17 was to be paid to Mugleston from the "net profit" of the companies, after payment of expenses, a management fee, principal and interest on the mortgages and other obligations, and income taxes of the companies. Raymond estimated it would be about 5 years before any substantial payments could be made to Mugleston on the balance of the purchase price owing to him. Also, in paragraph 3 of the contract, Mugleston agreed to loan money to the companies if needed to keep the mortgages and other obligations in good standing and if the earnings were not sufficient to carry them. Since the recovery of the remainder of his investment and the realization of any of his profit on the sale of his stock depended upon the earnings of the motel, cocktail lounge, and laundry, it obviously would not have been to his advantage for Mugleston to have competed with the businesses of the companies in any way which might have reduced their profits until he had received full payment of the $444,335.17 owed to him.

Not only was there no basis in fact for the covenant or arguable relationship with business reality, but there is no competent evidence that Mugleston had any intention of competing. He was a citizen and resident of Canada and apparently owned no other business in Oregon. The covenant not to compete was clearly without value. For the same reasons discussed above, payment of the amount assigned to it was not a "necessary" expense.

Respondent also contends that the covenant had no basis to amortize for the reason that payment of the $444,335.17 to Mugleston depended upon the companies having a "net profit" after payment of expenses and the other indebtednesses; that other than the initial cash payments of $40,000, no further payments were shown to have been made to Mugleston; that the companies never did in fact show a "net profit"; and, in view of the foreclosure proceedings in 1963 which resulted in the reacquisition of the respective motel properties by Herzog and Kraemer and by the Kings, that there is no possibility of any further payments to Mugleston. It is respondent's position that the obligation was contingent and indefinite and, therefore, not part of the cost basis for amortization purposes, citing *Inter-City Television Film Corp.*, 43 T.C. 270, 287 (1964); *Albany Car Wheel Co.*, 40 T.C. 831, affd. 333 F. 2d 653 (C.A. 2, 1964); *Lloyd H. Redford*, 28 T.C. 773 (1957); and other cases.

Petitioners agree that a contingent liability is not part of the basis for amortization but contend that here, although *payment* of the

obligation was contingent on the "net profit" earned by the business, the *liability* created by the purchase agreement was not contingent, and that the cost of the property includes the amount of such liability even though no payments were made to discharge it, citing *Crane* v. *Commissioner*, 331 U.S. 1 (1947); *Oxford Paper Co.* v. *United States*, 86 F. Supp 366 (S.D.N.Y. 1949); and *Consolidated Coke Co.* v. *Commissioner*, 70 F. 2d 446 (C.A. 3, 1934), affirming 25 B.T.A. 345.

The difficulty with petitioners' contention is that although the stock purchase agreement states the overall purchase price to be $1,131,000, of which $646,664.83 represented mortgages and other indebtedness which the corporations themselves were obligated to pay and $40,000 was paid by the petitioners in cash, the remaining $444,335.17 which included the $200,000 assigned to the covenant was to be paid *only* out of "net profit" of the companies. There was no provision that this balance or any portion thereof was to be paid by petitioners if the companies did not show a "net profit." Under these circumstances we think the obligation, as well as the payment, was contingent. We have considered the authorities cited by the parties but deem any discussion thereof to be unnecessary.

For the various reasons discussed above we hold that the covenant not to compete was not amortizable and accordingly sustain respondent's determination.

*Decisions will be entered for the respondent.*