**TRANSAMERICA CORPORATION, for itself and for all members of the Affiliated Group, Plaintiff,**

v.

**UNITED STATES of America, Defendant.**

**Nos. C 84–0877 TEH, C 85–2543 TEH.**

United States District Court, N.D. California.

Nov. 5, 1986.

Cameron W. Wolfe, Jr., W. Reece Bader, Orrick, Herrington & Sutcliffe, San Francisco, Cal., Alexander F. Wiles, Irell & Manella, Los Angeles, Cal., for plaintiff.

U.S. Attorney's Office, Joseph P. Russoniello, Chief, Jay Weill, Asst. U.S. Atty., Chief, Tax Div., San Francisco, Cal., Edward Meese, Atty. Gen., Dept. of Justice, Washington, D.C., for defendant.

## ORDER

THELTON E. HENDERSON, District Judge.

This matter comes before the court on cross-motions for summary judgment on plaintiff's claim for a tax refund for the years 1971 through 1974. Few, if any, facts are in dispute. The sole question for the court to determine is whether plaintiff was entitled to include in its basis for motion picture films in the years in question the estimated future participation and residual payments to be made to the films' performers, creators and various unions out of the proceeds from ticket sales to the general public. For the reasons stated below, the court concludes that plaintiff should not have included these payments in its basis and thus was not entitled to the full depreciation deductions claimed.

## I. FINDINGS OF FACT

Most of the facts in this matter have been stipulated to by the parties.

1. Transamerica ("Taxpayer") is, and at all material times has been, a Delaware corporation with its principal place of business in the City and County of San Francisco, California. Transamerica filed its consolidated federal income tax returns for the

years 1971 to 1973 with the District Director of Internal Revenue for the District of San Francisco. During each of those years, United Artists[1] was a wholly-owned subsidiary of Transamerica and its activities were reflected in Transamerica's consolidated federal income tax returns. Transamerica, during all of these years, was an accrual basis taxpayer.

2. On March 30, 1978 the Commissioner of Internal Revenue issued a statutory notice of deficiency to Transamerica for the year 1973 in the amount of $7,233,693. Transamerica paid $9,413,660.52, the amount of the deficiency, together with interest, to the United States on August 16, 1978. Transamerica filed a claim for refund with the Internal Revenue Service on July 31, 1980, and a supplemental claim for refund on August 15, 1980, with respect to that payment, raising in the claim, among numerous other issues, the disallowance by the IRS of a portion of United Artists claimed depreciation expense deductions relating to motion picture films. The claim for refund was denied with respect to the United Artists' depreciation issue and the complaint in C–84–0877–TEH was filed February 29, 1984.

3. On August 24, 1981 assessments were made against Transamerica for the years 1971 and 1972 in the amounts of $2,466,411 and $4,464,472, respectively, plus interest. Transamerica paid $3,704,-687.06 and $7,238,410.16, the amount of these assessments, together with interest on September 8, 1981. Transamerica filed claims for refund with respect to those payments on August 25, 1983, raising in those claims, among numerous other issues, the disallowance by the IRS of a portion of United Artists claimed depreciation expense deductions relating to motion picture films. The claim for refund was denied with respect to the depreciation issue and the action in C–85–2543–TEH was filed on March 20, 1985. The two complaints have been consolidated for all purposes.

4. This Court has jurisdiction of these suits under 28 U.S.C. § 1346(a)(1). Venue is proper in this district under 28 U.S.C. § 1402(a)(2).

5. The dispute here focuses on the propriety of the inclusion by United Artists as a part of its basis in motion picture films, for purposes of computing depreciation expense deductions, of estimates of United Artists' liability to producers, directors, actors, writers, and others who had contractual rights to receive certain payments dependent upon the performance of the particular film on which they had worked.

6. Prior to the release of each film it distributed, United Artists contracted to pay certain producers, writers, directors, actors and others a fee based in part on the performance of the film. These individuals contracted to receive from United Artists a flat fee for their services on a film together with a percentage of the film's future gross receipts or net profits. The percentage portions of these payments are known as "participations." During this period, United Artists also operated under collective bargaining agreements with guilds representing writers, actors, directors and others who contributed to the production of its films which required payment to those guilds of a percentage of all revenues it received from the television exhibition of each film it distributed. These payments are known as "residuals."

7. Under the Internal Revenue Code, the cost of producing a motion picture film cannot be deducted when incurred but instead must be depreciated and deducted over the useful life of that film. In Revenue Ruling 60–358, C.B. 1960–2, 68 (made applicable to motion picture films by Revenue Ruling 64–273, C.B. 1964–2, 62), the Internal Revenue Service announced that motion picture films may be depreciated using an income forecast method to determine the useful life of the film and the rate of depreciation to be applied against the costs of the film. This method provides for depreciation of film costs ratably over the

---

1. For purposes of this order, the names "Transamerica" and "United Artists" ("U.A.") and the term "taxpayer" are used interchangeably.

projected revenue stream of the film. Under the income forecast method of depreciation set forth in Revenue Ruling 60–358, a taxpayer forecasts at the end of each year, commencing with the year of release of a picture, the projected lifetime revenue less the costs of distribution ("net revenue") of each film it distributes. Under Revenue Ruling 60–358, this forecast figure becomes the denominator of the depreciation fraction and the actual net revenue received from the film in each year becomes the numerator of the fraction. The resulting fraction is then multiplied against the taxpayer's basis in the film which produced income during the taxable year to determine the allowable depreciation deduction in that year.[2]

8. United Artists used the income forecast method of depreciation for all films released after October 1, 1971. In determining the basis of each film for depreciation purposes, United Artists included the amounts of participations and residuals which would be paid if the projected lifetime revenue of the motion picture was achieved. United Artists used the year end forecasts of lifetime net revenue for each film (the same forecasts used for the income forecast method of depreciation) to calculate from its contracts the participation and residual payments which would be made if the film achieved its projected lifetime revenues. If the level of projected revenues were not reached during the life of the film, these projections would overstate the amount of participation or residual payments which would be made. If revenues above the level of projected revenues were received, these projections would un-

derstate the amount of participation and residual payments which would be made. United Artists performed this calculation each year for every film released after October 1, 1971. In each year, United Artists added the result of this calculation to the costs of producing each film to determine United Artists' basis in the film for depreciation purposes. United Artists then multiplied the depreciation fraction determined by the income forecast method times that basis to determine what it believed to be the proper amount of the depreciation expense deduction attributable to that film in a given year.[3]

9. The income tax deficiencies assessed against Transamerica for the years 1971–1974 involved, among other adjustments, the disallowance by the IRS of United Artists including in its basis for each film the amount of participations and residuals that had not yet become due and payable in a particular tax year. The United States contends that projected participation and residual costs should not be included in the cost basis of each film because the United States contends they are estimates of what might be paid, not actual costs. The United States allows such costs to be deducted in full in the year they actually become due and payable by United Artists.

10. Throughout the period it was owned by Transamerica, United Artists was a distributor of motion picture films. United Artists commissioned the production of virtually all of the films it distributed. Prior to the commencement of the production of a film, United Artists and the producer entered into a series of agreements defining their rights and obligations. Under the

---

**2.** Depicted algebraically, the government's approach to calculating annual depreciation is as follows:

When calculating annual net revenues, the government also permits the taxpayer to deduct

the participations actually paid in any given year.

**3.** The taxpayer's approach to calculating depreciation can be depicted as follows:

agreements, United Artists agreed to provide funds for the production of the film either directly or by causing a third party to provide funds to the producer. The producer, in turn, agreed to produce, complete, deliver and sell or lease a film to United Artists in exchange for a payment from United Artists. In virtually all instances that payment encompassed a flat fee payable at the time the film was produced and a percentage of the "gross receipts" of the film or a percentage of the "net profits" of the film. The terms "gross receipts" and "net profits" are defined in the agreements by including all income from all sources from the distribution of the film and then subtracting out set categories of costs, such as the expense of distributing or producing the film. By the time a film was released for exhibition, the producer had fully performed its obligations under the agreements.

11. The contracts with directors, writers and actors provided for similar payments to them in exchange for their contribution to the production of the film. Directors, actors and writers contracted to receive a flat fee for their contribution to the film and, in some instances, also contracted to receive a participation payment. These participation payments are calculated as a percentage of the "net profits" of the film, as a percentage of the "gross receipts" of the film or as differing percentages of both of these. By the time a film was released for exhibition, the director, actors and writers also had fully performed all of their obligations under the agreements.

12. In films which a director, writer, musician, stagehand or actor who was a member of a guild was employed, collective bargaining agreements with such guilds provided for payments to those guilds of a percentage of all revenues United Artists received from the television exhibition of such films.

13. The estimated participation and residual liabilities added to the basis of each film were calculated by members of United Artists' corporate accounting department. They relied totally on the forecasts of reve-

nues and distribution costs referred to above and upon United Artists' film contracts and legal department summaries of the film contracts to perform a mechanical calculation of the participation and residual liabilities which would be paid over the revenue life of the films if the film achieved the forecast level of net revenues.

14. The process used by United Artists to forecast net revenues for each of its films was substantially identical to that used throughout the motion picture industry during the time in question. UA did not make these forecasts solely for purposes of calculating its tax liability; these forecasts were critical to the correct presentation of UA's income statements and balance sheets.

15. Hindsight analysis of UA's approach to calculating depreciation reveals that UA forecast the lifetime revenue of its films-and thus its ultimate liability for participation payments-with reasonable accuracy. While UA's forecasts on individual films may have been significantly in error, its *aggregate* estimates were reasonable during the years in question. In 1972, UA deducted 107.1% of what it "should have" deducted had it known in advance what the actual lifetime revenues of its films would be. (I.e., UA took $12,189,336 in aggregate deductions when actual revenues through mid–1985 indicate $11,379,695 would have been the proper amount to deduct.) The figure for 1973 was 98.3% ($49,967,178 deducted vs. $50,822,146 "actual"). For 1974, the figure was 96% ($34,763,366 deducted vs. $36,199,763 "actual").

16. For individual films, UA occasionally misjudged their ultimate success and included in their basis estimates for future participation payments which never became due.

17. Overall, UA's approach resulted in higher depreciation deductions in the initial years of a film's life than did the government approach. The film Thunderbolt and Lightfoot provides an example of this discrepancy. The film was released in 1974. In that year, following its formula for calculating depreciation expenses, UA deducted $3,615,581 in depreciation for the film.

The government's formula would permit a deduction of only $2,436,677.

18. To the extent any of the foregoing Findings of Fact are deemed to be Conclusions of Law, they are incorporated herein by reference.

## II. CONCLUSIONS OF LAW

To the extent that any of the following Conclusions of Law are deemed to be Findings of Fact, they are incorporated herein by reference.

### A. Which Section of the Internal Revenue Code Governs?

Much of the debate between the parties has concerned which section of the Internal Revenue Code governs the deductions at issue. The taxpayer contends that 26 U.S.C. § 461 and its attendant "all events" test, *see United States v. Anderson*, 269 U.S. 422, 46 S.Ct. 131, 70 L.Ed. 347 (1926), determines the timing of the deductions. UA suggests it has met the provisions of this "all events" test and is entitled to the deductions claimed in its tax returns. The government argues that § 461 has nothing to do with the issue before the court. It asserts the timing of the deductions is determined by 26 U.S.C. § 1012 which defines the basis of property subject to depreciation. The government insists the participations payments at issue are merely contingent liabilities not includible in the basis of the films; thus—under both applicable case law and the I.R.S. regulations—these participations are not deductible until actually paid.

█ Neither the parties nor the court have found any cases which speak to the issue of which section of the Code should govern. For the reasons stated below, the court finds that the timing of the deduction of the participation payments is determined by the provisions of the "all events" test.

The I.R.S. contends that § 1012, which states that "the basis of property shall be the cost of the property," controls the issue of whether UA may include unpaid participation liabilities in basis. Treasury Regulation § 1.1012–1(a) provides that cost is the "amount paid for property in cash or other property." As the challenged depreciation deductions were based on estimated future participation obligations, and not on "cash or other property" actually paid during the years at issue, the government argues that § 1012 precludes the inclusion of these estimated payments in the basis for these films. Since UA would only have to make these participation payments if the films were successful, the government asserts UA's liabilities were wholly contingent and cites a series of cases holding that contingent liabilities cannot be included in a property's basis under § 1012. *See e.g., Lemery v. Commissioner*, 52 T.C. 367, *aff'd*, 451 F.2d 173 (9th Cir.1971); *Mayerson v. Commissioner*, 47 T.C. 340, 353–55 (1966).

Section 1012 does define the basis which is subject to depreciation and the cases interpreting this section have held that wholly contingent liabilities are not includible in basis. However, this analysis fails to address how an accrual taxpayer determines the cost of depreciable property under § 1012 when part of the cost, as here, is the taxpayer's undertaking of an obligation ultimately payable in money. More important, the government's approach creates a potential conflict in application between § 1012 and § 461 where one need not exist. The I.R.S. concern about the inclusion of overly contingent liabilities in the basis of a property of an accrual taxpayer can be addressed by applying the § 461 "all events" test in a manner consistent with the cases analyzing contingent liabilities under § 1012.

Section 461(a) states that deductions "shall be taken for the taxable year which is the proper taxable year under the method of accounting used in calculating taxable income." Section 167(a) in turn allows a depreciation deduction for exhaustion of property used in trade or business. Thus, under § 461(a), an accrual basis taxpayer such as UA should determine its depreciation deduction and hence its depreciable basis in accordance with accrual accounting rules.

■ The timing of deductions taken by a taxpayer using an accrual method of accounting is governed by the "all events" test. *Anderson, supra; United States v. Hughes Properties, Inc.*, 476 U.S. 593, 106 S.Ct. 2092, 90 L.Ed.2d 569 (1986). The test, as set forth in Treasury Regulation § 1.461–1(a)(2), is as follows:

> Under an accrual method of accounting, an expense is deductible for the taxable year in which all the events have occurred which determine the fact of the liability and the amount thereof can be determined with reasonable accuracy. However, any expenditure which results in the creation of an asset having a useful life which extends substantially beyond the close of the taxable year may not be deductible, or may be deductible only in part, for the taxable year in which it occurred. While no accrual shall be made in any case in which all the events have not occurred which fix the liability, the fact that the amount of the liability which has been incurred cannot be determined will not prevent the accrual within the taxable year of such part thereof as can be computed with reasonable accuracy.... Where a deduction is properly accrued on the basis of a computation made with reasonable accuracy and the exact amount is subsequently determined in a later taxable year, the difference, if any, between such amounts shall be taken into account for the later taxable year in which such determination is made.

The second sentence of this regulation makes clear that expenditures meeting the "all events" test and creating or improving assets with lives greater than one year may—when appropriate—be added to the basis of the assets in the year in which the "all events" test is met.

The government further argues, however, that the participation payments at issue should not be considered "expenditures" under Treas.Reg. § 1.461.1(a)(2) because they are too contingent. As UA's participation liabilities do not constitute expenditures, the "all events" text does not apply.

The Court finds this analysis misplaced. For accrual basis taxpayers, the core of the first prong of the "all events" test is the analysis of whether or not a potential commitment to pay money at a future date is too contingent to justify tax recognition. In analyzing whether all the events have occurred which fix the liability of the taxpayer, a court must certainly consider the continent nature of the transaction. To require a preliminary finding of non-contingency before applying the two prongs of the test would turn the test inside out.

Moreover, it is in applying this first prong of the "all events" test that the apparent conflict between § 1012 and § 461 can be resolved. In interpreting § 1012, the courts have consistently held that contingent liabilities cannot be included in basis. Application of the first prong of the "all events" test results in a very similar analysis. "The purpose of this requirement [the "fact of liability" inquiry] is to protect tax revenues by insuring that a taxpayer will not take deductions for expenditures that might never occur." *World Airways, Inc. v. Commissioner*, 62 T.C. 786, 802 (1974), *aff'd and adopted*, 564 F.2d 886 (9th Cir.1977) (citing *Mooney Aircraft, Inc. v. Commissioner*, 420 F.2d 400 (5th Cir.1969)). Assuming that a potential participation liability can be an "expenditure" subject to analysis under the "all events" test, if the liability is too contingent to meet the standards articulated in the § 1012 cases, then it is likely that the "fact of liability" has also not been established and the first prong of the "all events" test not satisfied.

■ The "conflict" between § 1012 and § 461 is thus less significant than first appears. Determining the appropriateness of inclusion of a liability in basis under either section involves an analysis of the contingent nature of that liability. To the extent a liability is too contingent to be "fixed" in a given year, an accrual basis taxpayer cannot include the liability in basis for the property. The task before the court in this case is to determine whether the future participation payments included in UA's basis in the years in question were

sufficiently definite to satisfy the "all events" test. For the reasons stated in the next section, the Court finds they were not.

## B. *The Fact of Liability Analysis*

As stated above, the "all events" test has two elements, each of which must be satisfied before accrual of an expense is appropriate. First, all the events which establish the fact of liability must have occurred. Second, the amount of the liability must be ascertainable "with reasonable accuracy." Treas.Reg. § 1.446.1(c)(1)(ii). If the expense creates an asset with a useful life of greater than one year, then the expenditure may not be immediately deductible; the taxpayer may be required to depreciate the expense over its useful life.

The Supreme Court has long emphasized that a "liability does not accrue as long as it remains contingent." *Brown v. Helvering*, 291 U.S. 193, 200, 54 S.Ct. 356, 359, 78 L.Ed. 725 (1934). As the Court asserted in its most recent term,

> [T]o satisfy the "all events" test, a liability must be 'final and definite in amount,' must be 'fixed and absolute,' and must be 'unconditional.' And one may say that 'the tax law requires that a deduction be deferred until all the events have occurred that will make it fixed and certain.' *Hughes*, 476 U.S. at ——, 106 S.Ct. at 2096 (citations omitted).

The taxpayer argues that its obligations to make the participation and residual payments were "fixed and certain" at the time the films were completed. UA points out that the ultimate recipients of these payments (the actors, producers, and others) had fully performed their contractual obligations to UA during the production of the films. UA asserts that this performance "fixed" UA's obligation to make the participation and residual payments and thus satisfied the first prong of the "all events" test.

The government responds by arguing that the performance of the contract by the artists did not suffice to establish the fact of liability under the test. UA's obligation to pay the base salaries of the artists may have been "fixed" by the completion of the film, but the government insists that UA's responsibility to make participation payments was not. These payments were dependent upon the commercial success of the films themselves. If the film was a flop, few, if any, participations or residuals were due. The government suggests that UA's liability was thus contingent upon a very fickle and unknowable source—the tastes of the movie-going public. As the payments were not due unless a sufficient number of viewers paid to see the film, the government argues the "fact" of UA's liability was not established by the completion of the film and was therefore too contingent to be included in the film's basis.

The Court finds the government's argument persuasive. Comparison of these participation liabilities with transactions examined by other courts indicate these liabilities were too contingent to accrue at the time of completion of the film. Although no cases are directly on point, many cases which have considered the contingent nature of transactions have reached conclusions contrary to that urged by United Artists. And those cases which have found liabilities to be sufficiently definite to permit deduction have involved facts significantly different from those before this court.

In *Lemery v. Commissioner*, 52 T.C. 367, *aff'd per curiam*, 451 F.2d 173 (9th Cir.1971), for example, a cash basis taxpayer bought a motel and restaurant business and then sought to amortize a portion of the purchase price which the parties had allocated to the seller's covenant not to compete. The payment for this covenant was to come only from the "net profits" of the business. If the business did not turn a profit, the taxpayer did not have to make payments on the covenant. The I.R.S. argued, *inter alia*, that this lack of guaranteed payment rendered the covenant too contingent to support amortization. The Tax Court agreed.

Although *Lemery* involved application of § 1012, and not § 461, the reasoning of the Tax Court is relevant to United Artists' situation. In *Lemery*, the taxpayer argued

that though the payment of the liability was contingent upon the "net profit" of the business, the liability created by the purchase agreement was not contingent. 52 T.C. at 377–78. In disallowing amortization of the covenant, the Tax Court rejected this argument. As "[t]here was no provision that this balance or any portion thereof was to be paid by petitioners if the the companies did not show a 'net profit,' ... we think the obligation, as well as the payment, was contingent." 52 T.C. at 378.

This argument applies with similar force to the participation liabilities of United Artist. UA argues that its agreement with the artists established the "fact of liability" to them and the question of how much, if any, would ultimately be paid is not part of this "fact of liability" analysis. However, as was the case in *Lemery*, United Artist was not obligated by contract to pay the artists a fixed sum.[4] If the film did not generate any income, or only a modest income, UA had little or no participation liability. This suggests the fact of UA's liability was not fixed until the public viewed its films.[5]

The Tax Court reached a similar conclusion in *World Airways*, 62 T.C. 786 (1974). In that case, the taxpayer entered into an agreement with another air carrier for the overhaul of the taxpayer's planes at a fixed price once they had flown a certain number of hours. As Federal Aviation Administration regulations required this overhaul be done at prescribed intervals-i.e., after a certain number of hours flown-each year *World* deducted a part of the cost of the future overhaul based on the number of hours flown in that year. *World* argued that the combination of its contract with

the other airline and the FAA regulations established the fact of its liability under the "all events" text and thus justified pro rata deductions of the cost of overhaul. *Id.* at 803.

The Tax Court held World was not entitled to deduct these costs until the overhaul was actually performed. Despite World's contract and the FAA regulations, the court reasoned that World's liability was not fixed until the work was done. For World to take these deductions, the court stated it must show "there are no sufficiently real or substantial contingencies which might relieve petitioner of its liability and thus there is little possibility that petitioner will take a deduction for an expense that will never occur." *Id.* The court concluded that if a plane should crash or become permanently grounded, or if World should become bankrupt, then it would never have to overhaul the planes. 62 T.C. 804. The court found these contingencies sufficiently real to justify denying deduction for the overhauls until they were performed. *Id.*

Similar reasoning applies to UA's participation liabilities. For those films which were economic failures, UA made little or no participation payments. Similarly, if UA had gone bankrupt during the period at issue, and had been unable to distribute its films, no participation payments would have been due. "The occurrences of any of these contingencies ... would not relieve petitioner of an *existing* obligation to pay [participations]. Rather, the occurrence would mean that no obligation to pay would ever come into existence." *Id.* at 804. Since no fixed obligation existed,

---

**4.** To the extent United Artists *was* obligated to pay a fixed sum on a fixed date, this obligation would have been includible in the basis for the film.

**5.** United Artists suggests that the facts of *Lemery* are sufficiently distinguishable to render it of negligible precedential value for the case before the court. Since the seller in *Lemery* was entitled to receive over $400,000 only if the business showed a profit, the Tax Court concluded it would have been foolish for the seller to establish a competing business. Therefore, the Tax Court found not only that the covenant was too

contingent to be amortized, but also that it was an illusory covenant with "no basis in fact or arguable relationship with business reality." 52 T.C. at 373. The Ninth Circuit agreed and did not reach the issue of the contingent nature of the covenant. 451 F.2d at 174.

The court agrees that these facts diminish the precedential import of *Lemery*. Nevertheless, the court finds persuasive the reasoning of the Tax Court on the issue of contingent liabilities and believes the contingent nature of the obligation in *Lemery* shares many similarities with the transactions before this court.

United Artists' liabilities did not satisfy the first element of the "all events" test.

United Artists argues that the facts in *World* distinguish it from the matter before the court. In *World*, the other airline could not fulfill its part of the contract until the overhauls were done; in contrast here, all of the artists had performed their full contractual obligations by completing the film. While this is a distinguishing feature of the case, this court does not find it dispositive. The very real contingency remained that individual films would fail; or, if UA's finances had waned, it might have been unable to promote the film as aggressively as it had anticipated. These contingencies prevented the "fact of liability" from being established until the movie-goers actually patronized the theaters.[6]

United Artists argues that the question of how many people would see its films is part of the second prong of the "all events" test. UA asserts that the number of movie-goers relates not to the "fact of liability" prong, but to the part of the "all events" test concerned with a taxpayer's ability to gauge the amount of its expenditure with "reasonable accuracy." The court does not agree. The fact that United Artists was able to make an intelligent and informed estimate of its aggregate film revenues does not change the contingent nature of the liability. As long as a significant possibility existed that UA would not have to make these payments, the "fact of the liability" remained uncertain.

A taxpayer may be able to estimate the timing and amount of a liability without the liability itself being fixed. In *Denver & Rio Grande Western R.R. Co. v. United States*, 505 F.2d 1266, 205 Ct.Cl. 597 (1974), a cash basis taxpayer sought to include in its basis for a railroad spur line the sum ($7.8 million) advanced by one of its customers for the construction of the line.

The railroad agreed to "refund" this advance from income generated from the spur line itself. For a period of ten years, after 100,000 tons a year had been shipped, the customer was entitled to receive a "refund" equal to 32% of the proceeds of the line. Once the customer had received the full $7.8 million, the entitlement was to cease.

The Court of Claims disallowed the inclusion of these funds in the railroad's basis because the taxpayer's obligation was too contingent. Though the court concluded that there was no uncertainty about the amount to be refunded or the parties' expectation that the funds would ultimately be returned, the obligation remained too contingent to justify inclusion in basis. The court found that "[i]nnumerable happenings could prevent that which was intended by the parties from becoming a reality, e.g., strikes or labor shortage, a reduction in the demand for potash, or an advance in mining technology which would make the ... mine no longer economically feasible to operate." 505 F.2d at 1270.

Although this case involved an analysis under § 1012, the court's examination of the contingent nature of the liability is once again instructive. Just as strikes in the mining industry could affect the shipping of ore, so might a strike of movie theatre employees, or a general downturn in the economy, have affected the rate at which the public attended movies.

United Artists argues the Court of Claims based its decision on the taxpayer's inability "to value the obligation assumed." *Id.* The Court of Claims did find it "impossible" to value the liability, but not because an informed estimate could not be made. The taxpayer argued that it could predict "'with reasonable certainty' that the advances made by [the customer] would be repaid in full." *Id.* Presumably, the tax-

---

**6.** United Artists also points out that, in *World,* the Tax Court noted that the overhaul expenses were not part of the operating expenses associated with the production of income in the years in which the deduction was sought. 62 T.C. at 805. In the matter before the court, however, the depreciation deduction sought is directly related to income claimed in the same year.

While this is a significant distinction between the cases, once again the court does not believe it renders *World* without precedential value. As with *Lemery,* the Tax Court's analysis of the contingent nature of the transaction aids this court in assessing the contingent aspects of the participation liabilities before the court.

payer would have been able to make an intelligent estimate, based on experience, of the amount of ore to be shipped over the ten years of the contract. Nevertheless, the Court of Claims refused to allow inclusion of the $7.8 million in the basis "[a]bsent a binding obligation on the Railroad's part to repay all of [the customer's] advances at the time the ... depreciation deductions were taken." *Id.* Thus, an intelligent guess about the amount of the liability ultimately to be paid—such as the one made by UA with regard to its films—does not remove the contingencies which prevent the "fact of liability" from being established.[7]

The taxpayer asserts that a relatively recent series of Ninth Circuit cases dealing with the deduction of estimated liabilities for Workmen's Compensation expenses is dispositive of the issue before this court. In these cases, *Crescent Wharf & Warehouse Co. v. Commissioner,* 518 F.2d 772 (9th Cir.1975); *Kaiser Steel Corp. v. United States,* 717 F.2d 1304 (9th Cir.1983); and *ESCO Corp. v. United States,* 750 F.2d 1466 (9th Cir.1985), the taxpayers were obligated by state law to maintain a workers' compensation program for their employees. Each year, the taxpayers deducted the estimated amount of future payments they would make arising from the injuries their employees had incurred during the year. As accrual basis taxpayers, they argued the workers' injuries established the "fact" of the taxpayers' ultimate liability for medical, disability and death payments. The Ninth Circuit agreed. *See e.g., Crescent Wharf,* 518 F.2d at 774. Since the taxpayers were also able to estimate the amount of their liability with "reasonable accuracy," the Ninth Circuit allowed each taxpayer to deduct the expenses under the "all events" rule.

However, these cases differ from UA's situation in an important respect. A worker's injury established the taxpayers' liability in a way completion of the film by United Artists did not. The worker's com-

pensation programs were mandated by state law and the fault of the employers had nothing to do with their liability. *See e.g., Crescent Wharf,* 518 F.2d at 773. Once a worker was injured, the employer was obligated to provide certain coverage. Thus, "injury establishes liability whether medical services are rendered or disability occurs at that moment or at a future time." 518 F.2d at 774. There were few contingencies associated with these claims. "[D]enial of liability by [the taxpayer] is extremely rare." 518 F.2d at 773. Moreover, in *Crescent Wharf,* the taxpayer removed these contingencies by refraining from deducting any contested claims until the conflicts were resolved. *Id.*

United Artists argues that as injury establishes liability to the worker, completion of a film established ultimate liability for participation payments. Just as the natural course of an injury would determine how great the workmen's compensation payments will be, so the public's attraction to a film determined the size of the participations.

In United Artists' situation, however, completion of the film only terminated the creative process. There still remained the difficulty of persuading the public to view the film. If the film did not strike a responsive chord, if UA proved ineffectual in promoting it, or if any other unforeseen event prohibited its economic success, UA was not obligated to make participation payments. In *Crescent Wharf* and its progeny, the Ninth Circuit expressly distinguished workmen's compensation liabilities from situations in which the fact of liability was in doubt. *See Crescent Wharf,* 518 F.2d at 775; *Kaiser Steel,* 717 F.2d at 1307. This court does not equate a physical injury and its definite economic consequences with the completion of a creative product whose economic success depended upon the vagaries of public taste and an industry's marketing techniques.

---

7. To allow an informed estimate about the ultimate amount of a liability to establish the "fact of liability" would conflate the two prongs of the "all events" test. "It is clear that the use of

the term 'sufficient to fix its liability' does not refer to the amount of the liability." *Crescent Wharf & Warehouse Co. v. Commissioner,* 518 F.2d 772, 774 (9th Cir.1975).

Moreover, UA is not obligated by law to ensure the participation payments are made. In the workmen's compensation cases, state law required the employers to provide a certain level of medical and disability care to injured workers. In similar fashion, in *Harrold v. Commissioner,* 192 F.2d 1002 (4th Cir.1951), and related cases,[8] the taxpayer was bound by state law (and by contract) to restore and replace the surface of land disturbed by its strip mining activities. The court held this definite obligation to restore the land entitled the accrual basis taxpayer to deduct a pro rata share of the cost of repairing the damage caused in the year in question. 192 F.2d at 1003.

In the Supreme Court's most recent term, it reached a like conclusion. In *United States v. Hughes Properties, Inc., supra,* the Court allowed a casino to accrue annually a deduction associated with amounts guaranteed for payment on "progressive" slot machines but not yet won by playing patrons. The I.R.S. argued that the "fact of liability" was not established until a patron made the actual winning pull. The Supreme Court disagreed and held that Nevada Gambling Commission regulations ensuring the ultimate payment of the progressive jackpot served to fix the taxpayer's liability. 476 U.S. at ——, 106 S.Ct. at 2096. Since state law removed any contingency that the jackpot would not be paid, the liability was certain and the casino was entitled to deduct it. *Id.*

No such level of certainty was attached to UA's obligation to make participation payments. UA argues it was contractually obligated to make good faith efforts to promote and distribute each film. However, this obligation is very different from a contractual or statutory requirement that a taxpayer made good on the very liability it seeks to deduct. UA has not shown it contracted to generate a specific level of public attendance at its films. As the court noted in *Lemery, supra,* absent a provision that the liability be paid even if no profit is

shown, the obligation remains too contingent for inclusion in basis. 52 T.C. at 378.

## C. *The Import of Special Reporting Rules*

United Artists further argues that the special reporting rules established by the I.R.S. for the film industry justifies allowing motion picture companies to deduct participation payments in the manner sought here. As the income forecast method of depreciating film costs mandated by Revenue Ruling 60–358 presumes the ability to project lifetime film revenues with accuracy, the taxpayer argues the same presumption of definiteness should permit depreciation deductions based on these projections. In support of this argument, UA cites a series of cases which it contends stand for the proposition that courts need not follow the "all events" test when special reporting provisions have been promulgated by the I.R.S. UA argues its method of calculating depreciation results in a better match of income and expenses and should thus be endorsed.

The court finds the cases cited by UA do not support the application of this approach here. In *Molsen v. Commissioner,* 85 T.C. 485, 5 T.C. No. 28, Tax Ct.Rep. (CCH) Dec. 42,406 (1985), the Tax Court allowed a cotton merchant to reduce its income by its estimated liability for cotton purchased on an open "on-call" price basis. The Tax Court allowed the merchant to claim higher costs for the cotton despite the fact that the ultimate price had not yet been fixed. The court rejected the Commissioner's argument that the "all events" test should control the tax treatment of the transaction. The court noted that—in the absence of this ruling—special reporting provisions adopted by the I.R.S. would require the taxpayer to claim tax on income it did not have. Tax Ct.Rep. (CCH) Dec. 42,406 at 3539. Moreover, the court characterized the claim as an "offset" against sales, and not a "deduction" of an expense under the "all events" test. *Id.* at 3540. Neither of

---

**8.** *Denise Coal Co. v. Commissioner,* 271 F.2d 930 (3rd Cir.1959); *Ohio River Collieries Co. v. Commissioner,* 77 T.C. 1369 (1981).

these distinctions are applicable to United Artists' situation.

The holding in *North American Life & Casualty Co. v. Commissioner*, 533 F.2d 1046 (8th Cir.1976), involved similar considerations. Special reporting provisions promulgated by the I.R.S. required insurance companies to include deferred premiums in their accrued income. When the taxpayer tried to offset against this income the commissions ultimately due on these premiums, the I.R.S. objected. As the commissions might never be paid if the premiums were not paid, the I.R.S. argued the "all events" test was not satisfied. In ruling in favor of the taxpayer, the court held that "consistency" and "fairness" demanded rejection of the "all events" test. Since the taxpayer had to claim the income associated with the future premiums, it should be entitled to offset the commissions as well. 553 F.2d at 1050–51.

United Artists is clearly not in this position. The income forecast method of calculating depreciation mandated by Revenue Ruling 60–358 does not require film companies to claim income before it is received. There is thus no question of consistency or fairness which might justify suspension of the application of the "all events" test. For this reason, the court declines to adopt the "matching" of income and expenses approach urged by the taxpayer.

### III. CONCLUSION

After analyzing the facts of this matter, and after considering the cases which have dealt with similar issues, the court concludes that United Artists was not entitled to include in the basis for its films the projected participation and residual costs not due and payable in the years at issue. The court finds the "all events" test provides the framework for analysis of this matter. As the court concludes that the "fact" of UA's liability to the artists was not established at the time of completion of the films, the court finds UA was not entitled to include its estimated liability in its films' basis. For this reason, the court grants summary judgment in favor of the government on this issue.

The parties have informed the court that several issues remain unresolved in these consolidated actions. The parties shall appear for a status conference at 8:30 a.m. on December 5, 1986, Courtroom 11, 450 Golden Gate Avenue, San Francisco, California. Not later than ten (10) days before this date, the parties shall file status conference certificates detailing the remaining issues in these cases and an estimate of the time frame for their resolution.

IT IS SO ORDERED.